IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CITY OF MEMPHIS                                                                    PLAINTIFF

VS.                                        CIVIL ACTION NO. No. 2:19-cv-02864-MSN-cgc

HORN LAKE CREEK BASIN INTERCEPTOR
SEWER DISTRICT and DESOTO COUNTY,
MISSISSIPPI                                                                       DEFENDANTS

---

**Defendants' Pretrial Memorandum and
Proposed Findings of Fact and Conclusions of Law**

---

Defendants Horn Lake Creek Basin Interceptor Sewer District ("District") and DeSoto County, Mississippi, submit the following pretrial memorandum and proposed findings of fact and conclusions of law:

**Pretrial Memorandum of Facts and Law**

Defendants' positions with respect to the facts and law are largely set forth in their Memorandum in Response to the City's Motion for Summary Judgment [Doc. # 91-1] and their Response to the City's Statement of Undisputed Material Facts [Doc. # 91-2]. To minimize redundancy, this memorandum will summarize and update those positions set forth in the aforementioned pleadings, briefly discuss additional items not addressed therein, and provide Defendants' proposed findings of fact and conclusions of law.

### I.    *Relevant facts*

This dispute arises from two related contracts: a Sewage Treatment Agreement dated February 6, 1975 ("1975 Agreement") and a Supplemental Agreement dated September 22, 1983 ("1983 Agreement"). The District is a public entity created by the Board of Supervisors of DeSoto County, Mississippi, under authority of House Bill No. 651, Laws of Mississippi of

1971. Its purpose is providing wholesale transportation and treatment of wastewater collected primarily by the cities of Southaven and Horn Lake, Mississippi (and their predecessors) on behalf of residents and businesses located within a portion of DeSoto County known as the Horn Lake Creek Basin ("Basin"). In 1972, the parties to this lawsuit entered into the first version of an agreement for Memphis to treat the District's wastewater ("1972 Agreement"). From 1972 to 1975, however, the District and its engineers continued to evaluate whether it was more economically and environmentally advantageous to construct its own new wastewater treatment facility or to contract with the City of Memphis to provide treatment of the District's wastewater. Ultimately, as evidenced by the 1975 Agreement, the District chose to contract with the City for long-term wastewater treatment.

This decision was based on several factors. First, due to the natural topography of the Basin, water naturally flows north to the Mississippi/Tennessee state line via gravity, meaning the District's system of sewer pipes – which serve approximately 75,000 people mostly in Southaven and Horn Lake – can transport wastewater to Memphis without the need for problematic and costly pumps. Second, via its Section 201/208 federal funding program, the Environmental Protection Agency at that time was encouraging "areawide" wastewater treatment programs (33 U.S.C. § 1251(a)(4)-(5), 1284(a)(1)), meaning federal funding was more readily available where metropolitan areas engaged in joint planning efforts. Ultimately, the District constructed – and continues to operate and maintain – its sewer interceptor line to transport wastewater for treatment in Memphis, a project that represented a massive public infrastructure investment.

Moreover, in 1974, the State of Mississippi transferred $5.7 million (approximately $33 million in 2023 terms) in federal funding to the State of Tennessee to help fund the Horn Lake

2

Interceptor on the Tennessee side of the state line, to facilitate wastewater transportation to the City's TE Maxson Wastewater Treatment Plant. The Tennessee section of the Interceptor serves not only to transport the District's wastewater to the Maxson facility, but also wastewater originating from certain areas of South Memphis; in fact, the construction of the Interceptor allowed the City to close a wastewater lagoon that was "loaded almost to capacity" and avoid the expense of constructing, operating, and maintaining a new lagoon. [Doc. # 91-9.] More detailed information regarding the national and local context in which the parties' relationship developed is set forth at [Doc. # 91-1 at 2-6].

The 1975 Agreement includes the provision that it "shall remain in effect for forty (40) years from the date hereof and *at the expiration of said time shall be subject to review and change agreeable to both parties*." (Emphasis added.) The 1975 Agreement does not contain any guidance on what happens if there is no such "review and change" that is "agreeable to both parties," and it contains no procedure for any party to unilaterally terminate the contract. This lack of a termination provision, and the absence of an expiration date for the contract itself, are consistent with the nature of the Agreement. It is not a standard business arrangement between private parties, but a unique public-infrastructure contract on which the parties relied in making substantial public investments to construct an entire sewer system. To renew a metaphor used in Defendants' Response to the City's motion for summary judgment, public bodies do not construct roads with the intent of abandoning them and starting over completely in 40 years. The roads may need repaving during that time, but as with sewer pipes and other public infrastructure, the system of roads as designed and constructed is intended to remain in place far longer than 40 years.

The parties constructed the Horn Lake Interceptor on each side of the state line at a total cost of approximately $12.3 million, the equivalent of approximately $80 million in 2023 terms. Thereafter, the parties updated their contractual relationship via the 1983 Agreement, whose purpose was to amend the parties' responsibilities with respect to industrial dischargers to the District's sewer collection system. The 1983 Agreement extended the aforementioned initial 40-year period from the 1975 Agreement by restarting it on September 22, 1983, and stated all provisions of the 1975 Agreement not in conflict with the 1983 Agreement "shall remain unaltered and fully binding on all parties." The 1983 Agreement did not add an expiration date, a termination provision, or a procedure for terminating the contract.

The very nature of the agreement, the use of federal funding that was contingent upon areawide wastewater treatment planning, and the parties' behavior during the intervening decades all support the conclusion that no party to the agreement intended the entire wastewater-treatment arrangement to end after the 1975 Agreement's 40-year period. Again, more detail is provided in Defendants' Response [Doc. # 91-1 at 7-9]. It is particularly salient that the District has never failed to make a payment for wastewater treatment, and that these payments – under the fee structure created by the 1975 Agreement – include not only the annually-calculated  and adjusted cost of the services Memphis has provided but also capital charges for improvements at the Maxson facility. Memphis' 30(b)(6) representative, Scott Morgan, testified at his deposition that the capital charges Memphis imposes on the District are for "capital improvement projects that are done to the treatment plant on a twenty-year recovery period that roll off after twenty years." [Doc. # 91-15.] Therefore, the City continues to charge capital costs to the District for Maxson improvements that will last well beyond 2023, yet claims the same contract requiring those payments allows the City to cut off the District's access to Maxson in September 2023.

Further indicating that the City knows wastewater treatment contracts are not generally intended to end, it has entered into explicitly perpetual wastewater treatment contracts with the municipalities of Germantown and Bartlett, Tennessee. [Doc. # 91-16.]

It is therefore Defendants' position that all parties understood their wastewater treatment agreement to be perpetual and non-terminable at the time of execution, and that the words of the 1975 Agreement – that at the end of 40 years, the agreement would be "subject to review and change agreeable to both parties" – have meaning. That is, if the contract were intended to expire at the end of 40 years, the 1975 Agreement would simply say so or at least provide a mechanism for termination. It does not. Given the plain language of the contract and the context in which it was made, the City's stated intention to cease providing wastewater treatment to the District in September 2023 amounts to an anticipatory breach of the parties' contract.

Nevertheless, understanding it is not in DeSoto County's best interest to continue entrusting a function as important as wastewater treatment to the City under current circumstances, the District has undertaken in earnest the process of funding, designing, and constructing a new wastewater treatment facility in Mississippi. After exploring all potential options, the District is now engaged in active negotiations with the DeSoto County Regional Utility Authority ("DCRUA"), which owns, maintains and operates a wastewater collection and treatment system serving the portions of DeSoto County not served by the District (*i.e.*, those areas where water does not naturally flow toward Memphis). In cooperation with DCRUA, the District is working toward a plan to expand and improve DCRUA's existing but small Johnson Creek wastewater treatment facility, which is the only DCRUA facility to which it is remotely feasible to pump District wastewater and which will need ten times its current treatment capacity before it can accept the District's wastewater.

In other words, the District is doing as the City demanded in its original 2018 letter that began this dispute [Doc. # 1-9]: enacting a plan to remove itself from the City's sanitary sewer system as soon as practicable. This process requires multiple complex actions, some of which require the cooperation of third parties beyond the District's control, including: 1) negotiating two separate agreements with DCRUA, one for the provision of long-term wastewater treatment and one for the shared funding and design of the necessary expansion of the Johnson Creek facility; 2) obtaining a combination of public and private (*i.e.*, financed) funding for the approximately $230 million project; 3) designing and constructing two new pump stations and an approximately 45,000-foot force main to transport the District's wastewater south (*i.e.*, against the natural gravity flow) from the current terminus of the District interceptor to the Johnson Creek facility; 4) obtaining property and/or easements to allow for the construction and operation of the pump stations and force main; 5) obtaining all necessary federal and state regulatory permits for the new facility; and 6) designing and constructing an expansion of the Johnson Creek facility to increase its treatment capacity from two million gallons per day ("MGD") to 13 MGD, with capacity to treat 20 MGD at peak flows. Optimistically, the District believes it can complete the process – which it first began no later than 2019 – by 2030. The District's expert engineer has estimated that the total process "could take as little as eight years in total; however, other factors entirely outside the District's control could just as easily result in a 13-year process instead." [Doc. # 91-3 at 8.]

## II. *The Court should consider both the plain language of the Agreements and evidence of context in ascertaining the parties' intent in entering the Agreements.*

As cited in Defendants' Response in opposition to summary judgment, the Tennessee Supreme Court has recently provided a detailed discussion of contract interpretation in Tennessee courts. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*,

566 S.W.3d 671, 694 (Tenn. 2019). While the plain language of a contract is generally accepted

to be the best indicator of the parties' intent, "Tennessee cases have also eschewed an extreme

textual approach. Instead, they reflect balance; they demonstrate a definite focus on the written

words of the parties' contract, but they also consider evidence related to the situation of the

parties and the circumstances of the transaction in interpreting those words." *Id.* at 692, 694.

"The search for the parties' intent should focus on the four corners of the contract, the

circumstances in which the contract was made, and the parties' actions in carrying out the

contract." *Id.* at 692, quoting *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012).

That balanced approach fits perfectly with the Agreements at issue here: the written words of the

contract state that as of September 2023, the parties' relationship is "subject to review and

change agreeable to both parties;" the "situation of the parties and the circumstances of the

transaction" illustrate that those words mean what they say, and not some implied intent that the

entire agreement would end instead.

   As *Individual Healthcare* makes clear, Tennessee courts take such a balanced approach

between the four corners of the contract on one hand, and the context of the agreement on the

other, in *all* contract-interpretation cases. As long as extrinsic factors are not used to "modify,

expand, or restrict" the plain language of the contract, such factors should be considered "even

for interpretation of a contract that seem[s] facially unambiguous." *Id.* at 693, citing *Hamblen

Cty. v. City of Morristown* 656 S.W.2d 331, 333-35 (Tenn. 1983). The case for considering

extrinsic evidence is further bolstered by the lack of a merger clause in either the 1975 or 1983

Agreement, given that merger clauses serve as indicators that the parties intended the contract to

be fully integrated. *Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, 329 F. App'x 892, 895 (6th

Cir. 2009).

Neither Agreement contains any other language altering the parties' intent with respect to whether the contract reflected the entire agreement between the parties, such as could serve as a replacement for an explicit merger clause. *See Adams v. Delk Indus., Inc.*, No. 3:19-CV-00878, 2021 WL 354096 at *10-11 (M.D. Tenn. Feb. 2, 2021) (noting the importance of merger clauses in identifying contracts as fully integrated, and relying on two other clauses indicating such intent to find the contract fully integrated). The very clause at the heart of this dispute provides an example of the contract missing vital information about the parties' arrangement: it provides that at the end of the 40-year period, the Agreement is "subject to review and change agreeable to both parties" but does not explicitly set forth what happens, if anything, in the event there is no such "change agreeable to both parties." As set forth below, the plain language of the contract supports the conclusion that in such a scenario, the parties intended the existing terms of the contract to continue beyond the 40-year period. But the contract's silence on that question is further support for the notion that evidence of context, including the very nature of the services to be provided and the District's reliance thereon, are appropriate considerations for the Court's analysis.

### III. Because the Agreements contain no termination or expiration provision, Tennessee law considers that it is either perpetual or terminable at will only upon reasonable notice, which is a heavily fact-dependent determination.

As set forth in detail in Defendant's Response in opposition to summary judgment, Tennessee cases call for a fact-intensive review of a contract without a termination clause or expiration date. The Response contains a long block-quote from *Johnson v. Welch*, No. M2002-00790, 2004 WL 239756 at *12-13 (Tenn. Ct. App. 2004), which in turn contains multiple citations regarding contracts lacking a duration or a termination provision. In summary, Tennessee case law is clear that where – as here – a contract does not contain an explicit

termination or expiration provision, it may be interpreted as perpetual, indefinite, or terminable "only upon reasonable notice." *Id.* at *12. "What is reasonable is determined by the intent of the parties and all the circumstances of the case, including the course of conduct of the parties and their reasonable contemplation and expectation." *Id.* Restated, what constitutes reasonable notice "is a fact specific inquiry dependent upon the length of the contractual relationship between the parties, the reliance which either party placed upon the continuing vitality of the contractual relationship, the particular business involved." *Id.* at *13, citing *Misco, Inc. v. United States Steel Corp.*, 784 F.2d 198, 203 (6th Cir. 1986); *P.S. & E. Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125 (7th Cir. 1972).

At base, the parties' Agreements ensure 75,000+ people have access to basic sanitation. The wastewater-treatment service for which the District has contracted with Memphis is not optional, nor an endeavor that can be "put on hold" while alternative arrangements are made. Based on the infrastructure investments underlying the Agreements, the human necessity of sewage treatment, the State of Mississippi's financial assistance in constructing the Tennessee portion of the Horn Lake Interceptor, the parties' participation in a long-term areawide wastewater treatment planning program, the fact that the Agreements contain no provision for any party to terminate them, and the inherent expense and time involved in constructing a new wastewater treatment facility, this is precisely the type of contract whose context indicates the parties intended it to be "perpetual" as contemplated by the court in *Johnson*.

Public entities do not invest in and construct major infrastructure with the intent that it be useful for only 40 years. An individual sewer pipe is of course not capable of lasting forever; but it does not follow that any municipality or utility district would ever plan for the entire system to need to be totally redesigned. In the 1970s, the District constructed a sewer system to transport

9

wastewater north to Memphis, via gravity flow consistent with the natural topography of the Horn Lake Creek Basin. In order to treat the wastewater in Mississippi, pump stations and a new force main will be required to "retrofit" a system designed for gravity flow north to instead pump sewage south to the Johnson Creek facility. In other words, it defeats the purpose of the Horn Lake Interceptor as designed and built, less than 50 years after its construction. The District simply cannot have had reason to contemplate, much less intended this result when it agreed to a wastewater treatment contract with Memphis. Rather, like the permanent infrastructure they built in reliance on the contract, all Parties clearly viewed the contract itself as permanent.

If, however, the Court does not view the contract as perpetual, at the very least it is terminable only upon reasonable notice – *i.e.*, the amount of time necessary for the District to complete the process of securing an alternative arrangement for wastewater treatment. For the entirety of that time, because of the lack of a termination or expiration provision, the current terms of the existing contract must simply remain in effect (including the existing formulae for annual cost adjustment). *See id.*

The parties have submitted expert reports with competing timelines for how long it should reasonably take the District to construct a new wastewater treatment facility – or expand an existing DCRUA facility – sufficient to treat its wastewater flows. Even the City's expert, Brad Davis, has opined (without detail or support) that "a wastewater plant built in north Mississippi that discharges into the Mississippi River could be completed in 6 to 7 years." [Doc. # 91-17.] The City first informed the District of its intent to cease providing wastewater treatment services in 2018 – just over five years before the City claims the contract expires. Given the District's understanding of the contract as perpetual, and the substantial evidence to support that reading of the contract, it is under no obligation to seek alternative treatment.

However, if the contract is interpreted as terminable upon reasonable notice, the City did not

provide reasonable notice *even according to its own expert's timeline*.

The District's expert, Tim Verner, P.E., has opined that the process of funding,

permitting, designing, and constructing a new facility – let alone negotiating an arrangement

with DCRUA and obtaining land and/or easements – would take a minimum of eight years under

perfect circumstances and up to 13 years depending on certain factors outside the District's

control. [Doc. # 91-3.] Given that Verner's expert opinion is supported by detailed timelines and

Davis' is little more than an *ipse dixit*, the District submits that "reasonable notice" to terminate

the Agreements, on the unique facts of this case, amounts to 8 to 13 years.

> ### a. *The plain language of the Agreements and the context of the parties' relationship illustrate that Defendants' reading of the contract is the only one that makes sense.*

While parol/extrinsic evidence may be used in interpreting the Agreements, such

evidence is merely confirmatory of the conclusion required by the plain language of the 1975

Agreement. The City's preferred reading requires the Court to add words that are not in the

Agreement and to ignore words that are. As noted above, neither Agreement contains an

expiration date and neither contains a termination provision. The 1975 Agreement, as amended

by the 1983 Agreement, states it "shall remain in effect for forty (40) years from the date hereof

and at the expiration of said time shall be subject to review and change agreeable to both

parties." As set forth in Defendants' Response in opposition to summary judgment, "subject to"

is a common phrase with a well-known meaning: "affected by or possibly affected by."[1] And the

metaphor provided in the Response remains instructive: a schedule that is "subject to change"

may or may not change depending on whatever factors are at play. If the tentative schedule is

---

[1] Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/subject%20to

ultimately finalized without change, it obviously does the opposite of changing – it *remains the same*. But in no scenario does "subject to change" mean "either it changes or it ceases to exist." Similarly, the parties agreed that the contract would remain the same, not even *subject to* change, for forty years beginning in 1975. That period was extended in 1983. The plain language of the contract makes clear that its precise terms are not "subject to change" until September 22, 2023, at which time the parties may renegotiate those precise terms *if they mutually choose to do so*. But if there is no change that is "agreeable to both parties," like the tentative schedule that was subject to change but ends up not changing, the parties' contract and cost formulae *remain the same*.

The contract also does not contain a notice provision or any other procedure for terminating the parties' agreement. While the City has implied its 2018 letter gave five years of purported notice which it did not have to give, in fact the lack of a notice provision further illustrates that the parties never contemplated that the Agreements could be terminated at all. That is, while the parties' experts disagree regarding the precise time required to construct a new wastewater treatment facility, it is undisputed that it would be a years-long endeavor. Under the City's proposed reading of the contract, it would be able to simply stop treating the District's wastewater without warning on September 23, 2023. Likewise, without advance notice the District could terminate the stream of wastewater and consequently the stream of millions of dollars of fee and capital revenue to the City. Such a reading simply makes no sense given the purpose and context of the Agreements. Rather, only two possible interpretations comport with the realities of the parties' circumstances: either they intended the Agreements to be perpetual, or they intended for them to be unchangeable through the 40-year period, after which it would continue unless one party chose to terminate it *upon reasonable notice*. *Johnson*, 2004 WL

239756 at \*12. If the Court adopts the latter interpretation, the contract would continue under its current terms during the reasonable-notice period, *i.e.* while the District works to complete an alternative treatment facility.

Under the City's interpretation, the period between September 2023 and the completion of a facility would be governed by no contract at all, yet the District would be unable to stop discharging its wastewater to the City. The City has repeatedly argued that it cannot be forced to negotiate or enter into a new contract. *See, e.g.,* [Doc. # 90-1]. The District agrees that new contract terms cannot be forced upon the parties; accordingly, if the contract is not considered perpetual, the current terms must continue in effect until the District can complete a new or expanded treatment facility and disconnect from the City's system.

> ### b. To the extent the parties intended the contract to be perpetual, the City's actions amount to an anticipatory breach and the District is entitled to damages.

As set forth above, the parties' clear intent based on the plain language, circumstances, context, and purpose of the Agreements was that the contract, like their infrastructure investments in reliance thereon, was permanent in nature. The City's continued insistence that it will cease providing wastewater treatment services to the District as of September 22, 2023 therefore amounts to a breach and/or repudiation of its obligations under the contract and the District is entitled to damages. Under Tennessee law, a party repudiates a contract when "the words and conduct of the contracting party amount to a total and unqualified refusal to perform the contract." *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007), quoting *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991). The City has clearly repudiated the parties' contract, via its March 28, 2018 letter initially announcing its intent to cease performing its contractual obligations in September 2023 [Doc. # 1-9]; its October 10 and October 29, 2018 follow-up letters confirming its position [Doc. # 1-10]; and its continued position in this lawsuit.

"When a repudiation occurs before the time that a contract requires a party to perform, the repudiating party has committed an 'anticipatory repudiation' or an 'anticipatory breach' of the contract." *UT Med. Grp.*, 235 S.W.3d at 120, citing *Church of Christ Home for Aged v. Nashville Trust Co.*, 202 S.W.2d 178, 183 (Tenn. 1947); 23 Samuel Williston, Treatise on the Law of Contracts § 63.29 (Richard A. Lord ed., 4th ed.2002). If the non-breaching party proves anticipatory breach, it is entitled "to a remedy for an *actual* breach of the contract, as if the anticipatory breach had occurred after the time for performance had arrived." *Id.* (emphasis in original) (additional citations omitted).

The measure of damages for breach of contract is that an "injured party is only entitled to be put in the same position he would have been in had the contract been performed." *Hennessee v. Wood Grp. Enterprises, Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991), citing, *inter alia*, *Chambliss, Bahner and Crawford v. Luther*, 531 S.W.2d 108 (Tenn. Ct. App. 1975). The District seeks nothing more than this. The project, including construction of two new pump stations, a new force main, and an expansion of the Johnson Creek facility, is expected to cost approximately $230 million. The District is therefore entitled to the difference between $230 million to construct an alternative wastewater treatment system, plus the cost to operate and maintain it, and what it would have paid to Memphis for wastewater treatment over the same period.

IV.   ***The City is not statutorily barred from entering an agreement for wastewater treatment lasting more than forty years.***

In its motion for summary judgment, the City contended it is statutorily barred by Tennessee Code § 7-51-902 from entering into a wastewater treatment contract lasting more than 40 years. That statute, enacted in 1983 and therefore not in effect at the time of the 1975 Agreement, did not stop the City from entering into *explicitly* perpetual contracts for wastewater

14

treatment with the municipalities of Germantown and Bartlett, Tennessee, in 2003. [Doc. # 91-16.] The statute authorizes municipalities to enter into contracts "with respect to capital improvement property for terms not to exceed forty (40) years or the useful life of the subject capital improvement property, whichever is less."

The City argues that because the wastewater-treatment contract requires it to *use* capital-improvement property like the Horn Lake Interceptor and the Maxson facility, the parties' contract is subject to the statute's limitations. But the City's own Germantown and Bartlett contracts belie that interpretation, as does the only Tennessee case citing the statute in its 40-year history. There, the Tennessee Court of Appeals applied a narrow interpretation of the statute, holding that it prohibits a municipality from leasing capital improvement property *from another entity* for more than 40 years, but is *entirely inapplicable* to a municipality seeking to lease *its own* property to another entity. *Helton v. City of East Ridge*, No. 03A01-9208-CV-00303, 1993 WL 124673 at *3 (Tenn. Ct. App. 1993). That is, the statute is "totally inapplicable" to any contract involving the Maxson facility and the Tennessee portion of the Interceptor, both of which are owned by the City. *Id.* In fact, the contract at issue here does not even rise to the level of the one in *Helton*, in which the municipality was actually leasing its property to a third party; here, Memphis has simply contracted to provide a service.

V.    **Even if the Court interprets the contract in the manner proposed by the City, it should not write a new contract for the parties.**

Courts, of course, do not "form a new contract under the guise of interpretation." *Individual Healthcare*, 566 S.W.2d at 692-93. The City's complaint [Doc. # 1] seeks no specific relief other than a declaratory judgment regarding its obligations beyond what the City inaccurately calls the "expiration" of the Agreements. To the extent the Court is inclined to adopt the City's reading of the contract, the Court should decline any invitation by the City to "form a

new contract" to govern the parties' relationship during the coming years while the District

works toward an alternative wastewater treatment solution.

**Proposed Findings of Fact and Conclusions of Law**

**Facts and Procedural Background**

1.      This dispute arises from two related contracts between the Horn Lake Creek Basin

Interceptor Sewer District ("District") and the City of Memphis, Tennessee ("City"): a Sewage

Treatment Agreement dated February 6, 1975 ("1975 Agreement") and a Supplemental

Agreement dated September 22, 1983 ("1983 Agreement"). The District is a public entity created

by the Board of Supervisors of DeSoto County, Mississippi, under authority of House Bill No.

651, Laws of Mississippi of 1971. Its purpose is providing wholesale transportation and

treatment of wastewater collected primarily by the cities of Southaven and Horn Lake,

Mississippi (and their predecessors) on behalf of residents and businesses located within a

portion of DeSoto County known as the Horn Lake Creek Basin ("Basin"). Pursuant to the 1975

Agreement, the District discharges wastewater collected from its customers in DeSoto County to

the City, which treats the wastewater in exchange for fees calculated according to an agreed

formula.

2.      The parties chose to contract for wastewater treatment due to several factors and

interests. First, due to the natural topography of the Basin, water naturally flows north to the

Mississippi/Tennessee state line via gravity, meaning the District's system of sewer pipes –

which serve approximately 75,000+ people mostly in the cities of Southaven and Horn Lake,

Mississippi – can transport wastewater to Memphis without the need for costly and problematic

pumps. Second, via its Section 201/208 federal funding program, the Environmental Protection

Agency at that time was encouraging "areawide" wastewater treatment programs (33 U.S.C. §

16

1251(a)(4)-(5), 1284(a)(1)), meaning federal funding was more readily available where metropolitan areas engaged in joint planning efforts. Several Memphis-area governmental entities participated in just such a joint planning program, under the aegis of the Mississippi-Arkansas-Tennessee Council of Governments.

3.      Ultimately, in the mid-1970s, the District constructed – and continues to operate and maintain – its sewer interceptor line to transport wastewater for treatment in Memphis. The interceptor line running from the Basin to the City's T.E. Maxson wastewater treatment facility is known as the Horn Lake Interceptor; the District owns and operates the portion of the Interceptor on the Mississippi side of the state line, and the City owns and operates the Tennessee section. To help construct the Tennessee section, in 1974 the State of Mississippi transferred $5.7 million in federal funding to the State of Tennessee. The Tennessee section of the Interceptor serves not only to transport the District's wastewater to the Maxson facility, but also wastewater originating from areas of South Memphis. The City further benefited from the Interceptor because its construction allowed the City to close a wastewater lagoon that was "loaded almost to capacity" and avoid the expense of constructing, operating, and maintaining a new lagoon.

4.      The 1975 Agreement provides that it "shall remain in effect for forty (40) years from the date hereof and at the expiration of said time shall be subject to review and change agreeable to both parties." The 1975 Agreement does not contain any guidance on what happens if there is no such "review and change" that is "agreeable to both parties," and it contains no procedure for any party to terminate the contract. This lack of a termination provision, and the absence of an expiration date for the contract itself, are unsurprising given the nature of the Agreement. It is not a standard business arrangement between private parties, but a unique

public-infrastructure contract on which the parties relied in making substantial public investments to construct an entire sewer system.

5.      The parties updated their contractual relationship via the 1983 Agreement, whose purpose was to amend the parties' responsibilities with respect to industrial dischargers to the District's sewer collection system. The 1983 Agreement extended the aforementioned 40-year period from the 1975 Agreement by restarting it on September 22, 1983, and stated all provisions of the 1975 Agreement not in conflict with the 1983 Agreement "shall remain unaltered and fully binding on all parties." The 1983 Agreement did not add an expiration date, a termination provision, or a procedure for terminating the contract.

6.      Since the District first began discharging wastewater to the City sewer system, the District has never failed to make a payment for wastewater treatment. These payments, calculated by the City under the fee structure created by the 1975 Agreement, include not only the cost of the services Memphis has provided but also capital charges for improvements at the Maxson facility. Memphis' 30(b)(6) representative Scott Morgan testified at his deposition that the capital charges Memphis imposes on the District are for "capital improvement projects that are done to the treatment plant on a twenty-year recovery period that roll off after twenty years."

7.      Via letter dated March 28, 2018 and signed by the City's Director of Public Works, Robert Knecht, the City informed the District that it had "decided it is in the best interest of Memphis not to renew its existing agreement with the District. Accordingly, Memphis will no longer extend wastewater treatment and collection services to the District upon expiration of the agreement which will occur on September 22, 2023." The parties held follow-up meetings to discuss the issue, at which the District expressed that it did not believe the Agreements expired on September 22, 2023, and that instead the specific terms of the Agreements would be "subject

18

to review and change agreeable to both parties" on that date. The City's Mayor Jim Strickland sent letters dated October 10, 2018 and October 29, 2018 to the mayors of Horn Lake and Southaven, in which the City refused to reconsider its position and reiterated that the City views the Agreements as expiring on September 22, 2023.

8.      After continued discussions, the City filed this declaratory action on December 17, 2019. The District filed its own action alleging, *inter alia*, breach or anticipatory breach of contract in the Northern District of Mississippi on December 20, 2019. That action was later transferred to this Court and was merged with the City's declaratory action for trial.

9.      While the litigation was pending, the District and elected officials in DeSoto County, Horn Lake, and Southaven determined that, regardless of whether the parties' contract is interpreted to expire at the end of the 40-year period, it was not in DeSoto County's best interest to continue entrusting a function as important as wastewater treatment to the City under the present circumstances. The District has therefore undertaken the process of funding, designing, and constructing a new wastewater treatment facility in Mississippi. Specifically, the District is engaged in active negotiations with the DeSoto County Regional Utility Authority ("DCRUA"), which owns, maintains and operates a wastewater collection and treatment system serving the portions of DeSoto County not served by the District. Both the District and DCRUA have begun the process of seeking funding to expand DCRUA's existing Johnson Creek wastewater treatment facility, which is the only DCRUA facility to which it is remotely feasible to pump District wastewater and which will need ten times its current treatment capacity before it can accept the District's wastewater.

**Analysis**

> ### I.   *Consideration of parol evidence.*

10.   The Tennessee Supreme Court has recently provided a detailed discussion of contract interpretation in Tennessee courts. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019). While the plain language of a contract is generally accepted to be the best indicator of the parties' intent, "Tennessee cases have also eschewed an extreme textual approach. Instead, they reflect balance; they demonstrate a definite focus on the written words of the parties' contract, but they also consider evidence related to the situation of the parties and the circumstances of the transaction in interpreting those words." *Id.* at 692, 694. "The search for the parties' intent should focus on the four corners of the contract, the circumstances in which the contract was made, and the parties' actions in carrying out the contract." *Id.* at 692, quoting *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012).

11.   *Individual Healthcare* makes clear that Tennessee courts take such a balanced approach between the four corners of the contract on one hand, and the context of the agreement on the other, in *all* contract-interpretation cases. As long as extrinsic factors are not used to "modify, expand, or restrict" the plain language of the contract, such factors should be considered "even for interpretation of a contract that seem[s] facially unambiguous." *Id.* at 693, citing *Hamblen Cty. v. City of Morristown* 656 S.W.2d 331, 333-35 (Tenn. 1983). Further supporting the use of extrinsic evidence in evaluating the Agreements at issue here is the lack of a merger clause or similar language in either the 1975 or 1983 Agreement, given that merger clauses serve as indicators that the parties intended the contract to be fully integrated. *See Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, 329 F. App'x 892, 895 (6th Cir. 2009); *Adams v. Delk Indus., Inc.*, No. 3:19-CV-00878, 2021 WL 354096 at *10-11 (M.D. Tenn. Feb. 2, 2021)

(noting the importance of merger clauses in identifying contracts as fully integrated, and relying on two other clauses indicating such intent to find the contract fully integrated).

12.     Indeed, the very clause at the heart of this dispute provides an example of the contract missing vital information about the parties' arrangement: it provides that at the end of the 40-year period, the Agreement is "subject to review and change agreeable to both parties" but does not set forth what happens, if anything, in the event there is no such "change agreeable to both parties." The contract's silence on that vital question is further support for considering evidence of context, including the very nature of the services to be provided and the District's reliance thereon.

## II.     Both the plain language of the Agreements and the context in which they were made support the conclusion that the parties did not intend the contract to expire in 2023.

13.     While extrinsic evidence may be used in interpreting the Agreements, such evidence is merely confirmatory of the conclusion required by the plain language of the 1975 Agreement. The 40-year period set forth in the 1975 Agreement and extended in the 1983 Agreement is not, based on its plain language, a "term" for the contract itself, nor is it an expiration or termination provision.

14.     The City's preferred interpretation would require this Court to add words that are not in the Agreement and to ignore words that are. The 1975 Agreement, as amended by the 1983 Agreement, states it "shall remain in effect for forty (40) years from the date hereof and at the expiration of said time shall be subject to review and change agreeable to both parties." "Subject to" is a common phrase with a well-known meaning: "affected by or possibly affected by."[2] A schedule that is "subject to change" may or may not change depending on the needs of

---

[2] Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/subject%20to

the organizer and participants. If the tentative schedule is ultimately finalized without change, it obviously does the opposite of changing – it *remains the same*. But in no scenario does "subject to change" mean "either it changes or it ceases to exist." Similarly, the parties agreed that the contract would remain the same, not even *subject to* change, for forty years beginning in 1975. That period was extended in 1983. The plain language of the contract makes clear that its precise terms are not "subject to change" until September 22, 2023, at which time the parties may renegotiate those precise terms *if they mutually choose to do so*. But if there is no change that is "agreeable to both parties," like the tentative schedule that was subject to change but ends up not changing, the parties' contract *remains the same*.

15.     Tennessee case law is clear that where – as here – a contract does not contain an explicit termination or expiration provision, it may be interpreted as perpetual, indefinite, or terminable "only upon reasonable notice." *Johnson v. Welch*, No. M2002-00790, 2004 WL 239756 at *12-13 (Tenn. Ct. App. 2004). "What is reasonable is determined by the intent of the parties and all the circumstances of the case, including the course of conduct of the parties and their reasonable contemplation and expectation." *Id.* Restated, what constitutes reasonable notice "is a fact specific inquiry dependent upon the length of the contractual relationship between the parties, the reliance which either party placed upon the continuing vitality of the contractual relationship, the particular business involved." *Id.* at *13, citing *Misco, Inc. v. United States Steel Corp.*, 784 F.2d 198, 203 (6th Cir. 1986); *P.S. & E. Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125 (7th Cir. 1972).

16.     The particular business involved here is that the parties' Agreements ensure 75,000 people have access to basic sanitation. The wastewater-treatment service for which the District has contracted with Memphis is not optional, nor an endeavor that can be "put on hold"

while alternative arrangements are made. Based on the infrastructure investments underlying the Agreements, the human necessity of sewage treatment, the State of Mississippi's financial assistance in constructing the Tennessee portion of the Horn Lake Interceptor, the parties' participation in a long-term areawide wastewater treatment planning program, the fact that the Agreements contain no provision for any party to terminate them, and the inherent expense and time involved in constructing a new wastewater treatment facility, this is precisely the type of contract whose context indicates the parties intended it to be "perpetual" as contemplated by the court in *Johnson*. Like the permanent infrastructure they built in reliance on the contract, the parties clearly viewed the contract itself as permanent when it was made.

17.     Even if the contract were not intended to be perpetual, it would be terminable only upon "reasonable notice." In the unique context of this contract, "reasonable notice" is best defined as the period of time it would reasonably take the District to fund, permit, and construct a new wastewater treatment facility (or expand an existing DCRUA facility). Both parties presented expert testimony regarding the length of time in which this could reasonably be accomplished, with the City's expert estimating five to seven years and the District's estimating eight to 10 years. The Court finds this dispute moot: the clock on a "reasonable time" does not begin running until the Agreements' 40-year period ends on September 22, 2023 (the first date on which the City could claim to have the right to terminate the Agreements upon reasonable notice), and the District has already begun good-faith efforts to seek alternative treatment options. Therefore, if hypothetically the contract were not to be considered perpetual, a specific period of time need not be attached to the "reasonable notice" period as long as the District remains engaged in its efforts to disconnect from the City's system.

### III.     The City's actions amount to an anticipatory breach and the District is entitled to damages.

18.     As set forth above, the parties' clear intent based on the circumstances, context, and purpose of the Agreements was that the contract, like their infrastructure investments in reliance thereon, was permanent in nature. The City's continued insistence that it will cease providing wastewater treatment services to the District as of September 22, 2023 therefore amounts to a breach and/or repudiation of its obligations under the contract and the District is entitled to damages. A party repudiates a contract when "the words and conduct of the contracting party amount to a total and unqualified refusal to perform the contract." *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007), quoting *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991). The City has clearly repudiated the parties' contract, via its March 28, 2018 letter initially announcing its intent to cease performing its contractual obligations in September 2023; its October 10, and October 29, 2018 follow-up letters confirming its position; and its continued position in this case.

19.     "When a repudiation occurs before the time that a contract requires a party to perform, the repudiating party has committed an 'anticipatory repudiation' or an 'anticipatory breach' of the contract." *UT Med. Grp.*, 235 S.W.3d at 120, citing *Church of Christ Home for Aged v. Nashville Trust Co.*, 202 S.W.2d 178, 183 (Tenn. 1947); 23 Samuel Williston, Treatise on the Law of Contracts § 63.29 (Richard A. Lord ed., 4th ed.2002). If the non-breaching party proves anticipatory breach, it is entitled "to a remedy for an *actual* breach of the contract, as if the anticipatory breach had occurred after the time for performance had arrived." *Id.* (emphasis in original).

20.     The measure of damages for breach of contract is that an "injured party is only entitled to be put in the same position he would have been in had the contract been performed."

24

*Hennessee v. Wood Grp. Enterprises, Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991), citing,

*inter alia*, *Chambliss, Bahner and Crawford v. Luther*, 531 S.W.2d 108 (Tenn. Ct. App. 1975).

The District presented evidence that a project including construction of two new pump stations, a

new force main, and an expansion of the DCRUA Johnson Creek facility is expected to cost

approximately $230 million. The District is therefore entitled to the difference between $230

million to construct an alternative wastewater treatment system plus the cost to operate and

maintain it, and what it would have paid to Memphis for wastewater treatment over the same

period.

IV.   ***The City is not statutorily barred from entering an agreement for
      wastewater treatment lasting more than forty years.***

21.   The City contends it is statutorily barred by Tennessee Code § 7-51-902 from

entering into a wastewater treatment contract lasting more than 40 years. That statute, enacted in

1983 and therefore not in effect at the time of the 1975 Agreement, did not stop the City from

entering into *explicitly* perpetual contracts for wastewater treatment with the municipalities of

Germantown and Bartlett, Tennessee, in 2003. The statute authorizes municipalities to enter into

contracts "with respect to capital improvement property for terms not to exceed forty (40) years

or the useful life of the subject capital improvement property, whichever is less."

22.   The City argues that because the wastewater-treatment contract requires it to *use*

capital-improvement property like the Horn Lake Interceptor and the Maxson facility, the

parties' contract is subject to the statute's limitations. But the City's own Germantown and

Bartlett contracts belie that interpretation, as does the only Tennessee case citing the statute in its

40-year history. There, the Tennessee Court of Appeals applied a narrow interpretation of the

statute, holding that it prohibits a municipality from leasing capital improvement property *from*

*another entity* for more than 40 years, but is "totally inapplicable" to a municipality seeking to

lease *its own* property to another entity. *Helton v. City of East Ridge*, No. 03A01-9208-CV-00303, 1993 WL 124673 at *3 (Tenn. Ct. App. 1993). The statute is therefore also "totally inapplicable" to any contract involving the Maxson facility and the Tennessee portion of the Horn Lake Interceptor, both of which are owned by the City. *Id.* Of course, the contract at issue here does not even rise to the level of the one in *Helton*, in which the municipality was actually leasing its property to a third party; here, Memphis has simply contracted to provide a service.

**IT IS THEREFORE ORDERED** that the City's request for declaratory judgment pursuant to 28 U.S.C. § 2201 is DENIED.

**IT IS FURTHER ORDERED** that the City's request for costs is DENIED.

**IT IS FURTHER ORDERED** that the City's request for any "further relief" is DENIED.

**IT IS FURTHER ORDERED** that the City is liable to the District for money damages in an amount equal to the difference between the cost of constructing, operating, and maintaining all facilities necessary to cease discharging the District's wastewater to the City's sewer system, and the amount the District would have paid to the City for wastewater treatment.

**IT IS FURTHER ORDERED** that the Parties shall submit, within 90 days of the entry of this Order, proposed calculations for such damages, including supporting documents.

**IT IS FURTHER ORDERED** that, until such time as the District has a new facility to which it can legally discharge its wastewater for treatment, the current terms of the parties' Agreements shall remain in full force and effect.

Respectfully submitted, this the 27th day of March, 2023.

HORN LAKE CREEK BASIN INTERCEPTOR
SEWER DISTRICT


By:/s/ W. Abram Orlansky
    W. Abram Orlansky

OF COUNSEL:

Michael Gwin (MSB No. 5086)
Keith W. Turner (MSB No. 99252)
W. Abram Orlansky (MSB No. 104172)
Watkins & Eager PLLC
400 East Capitol Street
Jackson, Mississippi 39201
Post Office Box 650
Jackson, Mississippi 39205
Telephone: (601) 965-1900
Facsimile: (601) 965-1901
Email: kturner@watkinseager.com
    mgwin@watkinseager.com
    aorlansky@watkinseager.com

William A. Brown (MSB No. 4708)
Mary Lee Walker Brown (MSB No. 4662)
Walker, Brown & Brown, P.A.
Post Office Box 276
Hernando, Mississippi 38632
Telephone: (662) 429-5277
Facsimile: (662) 429-5280
Email: bbrown@wbblaw.us
    marylee@wbblaw.us

DeSOTO COUNTY, MISSISSIPPI

By:/s/ Samuel T. Barber_____
    Samuel T. Barber

OF COUNSEL:

Anthony Nowak (MSB No. 10528}
Samuel T. Barber (MSB No. 105018)
Smith, Phillips, Mitchell, Scott & Nowak, LLP
Post Office Box 346
Hernando, Mississippi 38632
Telephone: (662) 429-5041
Facsimile: (662) 429-0107
Email: sbarber@smithphillips.com
    tony@smithphillips.com

<u>Certificate of Service</u>

    I hereby certify that on March 27, 2023, I served the foregoing to the following counsel of record:

    Bruce A. McMullen
    Carmalita Philina Carletos-Drayton
    Mary Wu Tullis
    Pete A. Brunson
    165 Madison Avenue, Suite 2000
    Memphis, Tennessee 38103

    Anthony Nowak
    Samuel T. Barber
    Smith, Phillips, Mitchell, Scott & Nowak, LLP
    Post Office Box 346
    Hernando, Mississippi 38632

    This the 27th day of March, 2023.

    /s/ W. Abram Orlansky_____
    W. Abram Orlansky