**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

CITY OF MEMPHIS,

      Plaintiff,

vs.                                   Civil Action No. 2:19-cv-02864-MSN-cgc

HORN LAKE CREEK BASIN
INTERCEPTOR SEWER DISTRICT and
DESOTO COUNTY, MISSISSIPPI,

      Defendants.

---

**PLAINTIFF CITY OF MEMPHIS' PRETRIAL MEMORANDUM
AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

Plaintiff City of Memphis (the "City") hereby submits this Pretrial Memorandum and Proposed Findings of Fact and Conclusions of Law pursuant to this Court's Notice of Setting (ECF No. 101) and Local Rule 16.4 as follows:

## INTRODUCTION

The City's contentions with respect to the facts and law at issue in this case are set forth in the City's Memorandum of Law in Support of Its Motion for Summary Judgment (ECF No. 90-1) and its Reply to Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 92). In short, the City's request for declaratory judgment asks the Court to make two findings concerning the parties' wastewater treatment agreement. First, the City asks the Court to find that under paragraph 8 of the September 22, 1983 Supplemental Agreement ("1983 Agreement") the parties' contract expires by its own terms, without the action of either party, forty (40) years after the date of execution of the 1983 Agreement. Second, the City asks the Court to find that the City is not contractually obligated to negotiate a renewal of the parties' wastewater

1

treatment agreement or to negotiate a new contract with Defendants.  It is the City's position that both of these requested findings are supported by the unambiguous terms of the parties' contract.

Further, Defendants are not entitled to relief based on their claim of anticipatory breach because the parties' wastewater treatment agreement expires by its own terms on September 22, 2023.  It is indisputable that the City continues to provide the services required under the parties' contract and will continue to provide them until the agreement naturally expires later this year. Defendants have no claim for anticipatory breach because the City continues to fulfill its obligations under the contract.

For these reasons, the City asks the Court to enter a declaratory judgment in the City's favor finding that the parties' wastewater treatment agreement expires by its own terms on September 22, 2023, and that the City has no further obligations under the parties' contract after that date.

## PROPOSED FINDINGS OF FACT

1.      In 1966, the City and Shelby County, Tennessee ("Shelby County") commissioned a feasibility study concerning the comprehensive wastewater treatment needs of Shelby County. (ECF No. 91-2, ¶ 1.)

2.      The feasibility study area was limited to drainage basins located in Shelby County. (ECF No. 90-2, ¶ 2.)

3.      The City and Shelby County commissioned the report, in part, to plan for the location and design of wastewater treatment facilities to serve the City and Shelby County's present and future wastewater treatment needs.  (*Id.*, ¶ 3.)

4.      This study culminated in the "Waste Water Treatment Facilities Engineering Report" (commonly known as the "Green Book"), which was jointly drafted by the engineering firms Allen & Hoshall and Clark, Dietz & Associates in 1969.  (ECF No. 91-2, ¶ 4.)

5.      The Green Book recommended that the City and/or Shelby County construct two wastewater treatment plants in Shelby County to meet the wastewater treatment needs of the City and Shelby County.  (ECF No. 90-2, ¶ 5.)

6.      One of these recommended treatment plants, the south plant, became the T. E. Maxson Wastewater Treatment Plant ("T.E. Maxson WWTP").  (*Id.*, ¶ 6.)

7.      Planning for the construction of the T. E. Maxson WWTP began in approximately 1970.  (ECF No. 91-2, ¶ 7.)

8.      Construction of the T.E. Maxson WWTP began in approximately 1971.

9.      The T. E. Maxson WWTP began operations in 1975.  (*Id.*, ¶ 8.)

10.      The City expected the T. E. Maxson WWTP to have a twenty (20) year useful life at the time it was constructed.  (ECF No. 90-2, ¶ 9.)

11.      In or around 1970, DeSoto County approached the City to request assistance in developing a comprehensive plan for the collection and treatment of sewage wastewater generated in the Horn Lake Creek Drainage Basin.  (*Id.*, ¶ 10.)

12.      DeSoto County specifically sought Memphis' assistance in preparing a "feasibility study and application for Federal funds" for a sewer collection and treatment facility to manage the sanitary wastewater flow from the Horn Lake Creek Basin.  (*Id.*, ¶ 11.)

13.      On or about February 1, 1971, DeSoto County and Memphis entered into an agreement whereby Memphis would prepare a comprehensive plan for wastewater collection and treatment facilities in the Horn Lake Creek Drainage Basin.  (*Id.*, ¶ 13.)

14.     The Water Pollution Control Department of the City of Memphis prepared the Horn Lake Creek Basin Wastewater Collection & Treatment Comprehensive Plan ("Comprehensive Plan") in or about May 1971.  (*Id.*, ¶ 14.)

15.     The Comprehensive Plan proposed the construction of the Horn Lake Creek Basin Interceptor stretching from the T. E. Maxson WWTP (south treatment plant) into DeSoto County. (*Id.*, ¶ 15.)

16.     The Comprehensive Plan provided that DeSoto County would provide the funds for the construction and maintenance of all sewers within the Horn Lake Creek Basin located in DeSoto County, including the portion of the Horn Lake Creek Basin Interceptor located in DeSoto County.  (*Id.*, ¶ 16.)

17.     The Comprehensive Plan provided that Memphis would construct, operate, and maintain the portion of the Horn Lake Creek Basin Interceptor located in Shelby County, as well as the necessary wastewater treatment facilities to be used by the Horn Lake Creek Basin Interceptor.  (ECF No. 90-2, ¶ 17.)

18.     In 1971, the DeSoto County Board of Commissioners formed the Horn Lake Creek Basin Interceptor Sewer District pursuant to the authority granted by Mississippi House Bill No. 651.  (ECF No. 91-2, ¶ 18.)

19.     On March 10, 1972, the District's commissioners approved a resolution whereby "the District would contract with the City of Memphis for treatment of wastewater rather than construct its own treatment facilities."  (*Id.*, ¶ 19.)

20.     On June 6, 1972, a sewage treatment agreement ("1972 Agreement") was entered into between Memphis, the District, and DeSoto County.  (*Id.*, ¶ 20.)

21.     The 1972 Agreement provided, in part, that:

> This agreement shall remain in effect for thirty (30) years from the date hereof and at the expiration of said time shall be subject to review and change agreeable to both parties.

(*Id.*, ¶ 21.)

22.    In 1974, the Mississippi-Arkansas-Tennessee Council of Governments ("MATCOG") began facilitating the planning of an area-wide wastewater collection and treatment system for Shelby County and parts of Tipton County, Tennessee; Crittenden County, Arkansas; and DeSoto County.  (*Id.*, ¶ 22.)

23.    MATCOG and the Mississippi Delta Development District ("MDDD") published the "Area Wide Waste Treatment Management Plan, Planning: Process and Procedures" in January 1975, which was intended to foster the development of an area-wide waste treatment management program consisting of all of Shelby County, the southern portion of Tipton County, Tennessee, and the northern portion of DeSoto County.  (*Id.*, ¶ 23.)

24.    MATCOG's plan was funded by the Environmental Protection Agency pursuant to Section 208 of the Federal Water Pollution Control Act of 1972.  (ECF No. 90-2, ¶ 24.)

25.    Area-wide water quality management planning pursuant to Section 208 was focused on developing wastewater treatment processes for metropolitan areas. (*Id.*, ¶ 25.)

26.    Section 208 planning funds were not used for construction costs.  (*Id.*, ¶ 26.)

27.    Smaller communities that fell within the boundaries of the Section 208 area—due to their proximity with the larger municipality—were able to obtain EPA funding priority comparable to the larger municipality.  (*Id.*, ¶ 27.)

28.    The initial determination of which local areas could be included within the planning area was made by the governing state.  (*Id.*, ¶ 28.)

29.     Once that initial determination was made, then the governing body of each municipality located within the Section 208 area could decide whether it would participate in the area-wide planning process. (ECF No. 91-2, ¶ 29.)

30.     The overarching goal of Section 208 was to have the individual municipalities within the planning area bind together to create a central governing authority for wastewater treatment in the area.  (ECF No. 90-2, ¶ 30.)

31.     The intent of MATCOG's plan was not to have Memphis treat the wastewater of every municipality included in the Section 208 planning area.  (*Id.*, ¶ 31.)

32.     Ultimately, a regional sewer authority was never created in the Memphis area.  (*Id.*, ¶ 33.)

33.     Further, MATCOG's plan was based on a twenty (20) year time horizon.  (*Id.*, ¶ 32.)

34.     The EPA awarded the City funds to construct the T.E. Maxson Wastewater Treatment Plant in March 1970, almost five (5) years before MATCOG published its Section 208 plan.

35.     Operations at the T. E. Maxson Wastewater Treatment Plan began in 1975.  (ECF No. 91-2, ¶ 35.)

36.     As of December 1, 1975, the Horn Lake Creek Basin Interceptor had still not been constructed.  (ECF No. 90-2, ¶ 36.)

37.     The District was responsible for the construction and operation of the portion of the Horn Lake Interceptor located in DeSoto County. (ECF No. 91-2, ¶ 37.)

38.     In an effort to obtain funding for its portion of the construction costs of the Horn Lake Interceptor, the District applied for loans from the Farmers Home Administration ("FHA"). (*Id.*, ¶ 38.)

39.     The FHA eventually approved a construction loan for the District that was repayable over a period of forty years from the date the loan was closed.  (*Id.*, ¶ 39.)

40.     As part of its loan process, FHA required the District to renegotiate the 1972 Agreement to account for updated construction and operation costs.  (*Id.*, ¶ 40.)

41.     MATCOG was not involved in negotiations between Memphis and the District. (ECF No. 90-2, ¶ 41.)

42.     As part of this renegotiation process, the District requested that the duration of the 1972 Agreement be amended "to provide that the agreement will be in effect for forty years.  The forty years we anticipate will be required by Farmers Home Administration who is lending the Mississippi District the local contribution over a forty year term."  (*Id.*, ¶ 42.)

43.     Memphis, the District, and DeSoto County executed a new sewage treatment agreement on or about February 6, 1975 (the "1975 Agreement").  (ECF No. 1-6; ECF No. 91-2, ¶ 43.)

44.     Paragraph 11 of the 1975 Agreement states that:

This agreement shall remain in effect for forty (40) years from the date hereof and at the expiration of said time shall be subject to review and change agreeable to both parties.

(ECF No. 1-6 at PageID 25; ECF No. 91-2, ¶ 44.)

45.     The forty-year duration agreed upon by the parties to the 1975 Agreement was to satisfy the District's loan obligations with the FHA.  (ECF No. 90-2, ¶ 45.)

46.     The 1975 Agreement was ratified by the Memphis City Council on March 4, 1975. (ECF No. 91-2, ¶ 46.)

47.     The District's commissioners had approved the language of the 1975 Agreement on September 3, 1974.  (*Id.*, ¶ 47.)

48.     Neither the City's resolution nor the District's resolution references the duration of the 1975 Agreement.  (*Id.*, ¶ 48.)

49.     The 1975 Agreement replaced and voided the terms of the 1972 Agreement.  (*Id.*, ¶ 49.)

50.     The 1975 Agreement provided, in Paragraph 4, that the parties would later "negotiate a special rate for the District" if "an industry locates within the District requiring discharge into the mains a large amount of wastewater in its production processes . . . ."  (*Id.*, ¶ 50.)

51.     On September 22, 1983, Memphis, the District, and DeSoto County entered into a supplemental agreement (the "1983 Agreement") to account for the industrial dischargers that were located in the District.  (*Id.*, ¶ 51.)

52.     Paragraph 8 of the 1983 Agreement provided that, "It is further agreed that the effective duration of the February 5 (sic), 1975 Agreement as modified by this Supplemental Agreement shall be extended for a period of forty (40) years from date of execution of this Supplemental Agreement."  (ECF No. 1-8 at PageID 30; ECF No. 91-2, ¶ 52.)

53.     The 1983 Agreement stated, in Paragraph 9, that: "It is further agreed that only the provisions of the February 6, 1975 Agreement that conflict in intent with the provisions set out herein are amended, and the remainder of said Agreement shall remain unaltered and fully binding on all parties."  (ECF No. 1-8 at PageID 30; ECF No. 91-2, ¶ 53.)

54.     The 1983 Agreement was signed by then City of Memphis Mayor Richard C. Hackett.  (ECF No. 1-8 at PageID 31; ECF No. 91-2, ¶ 54.)

55.     Mayor Hackett testified that he remembered signing the 1983 Agreement because "40 years is probably a little out of the ordinary" and making an agreement "[a]cross the state lines was not something you did every day either."  (ECF No. 91-2, ¶ 55.)

56.     Mayor Hackett testified that he "morally did not want to obligate the City of Memphis taxpayers to another state, another city" for longer than the necessary period of time. (ECF No. 90-2, ¶ 56.)

57.     Mayor Hackett testified that he agreed to the forty (40) year duration of the 1983 Agreement because that definite term "put a limit on" the duration of Memphis' obligations and meant it "wasn't going to obligate some administration down the road."  (*Id.*, ¶ 57.)

58.     Memphis intended the 1983 Agreement to be in effect for only forty (40) years. (*Id.*, ¶ 58.)

59.     Approximately thirty-five (35) years after the 1983 Agreement was executed, Robert Knecht, Director of Public Works for the City of Memphis, informed the District by letter on March 28, 2018 that, "Memphis will no longer extend wastewater treatment and collection services to the District upon expiration of the agreement which will occur on September 22, 2023." (ECF No. 1-9 at PageID 33; ECF No. 91-2, ¶ 59.)

60.     Mr. Knecht's March 2018 letter further informed the District that "Memphis will continue to honor its contractual obligations" under the 1975 and 1983 Agreements up until their expiration on September 22, 2023. (ECF No. 1-9 at PageID 34; ECF No. 91-2, ¶ 60.)

61.     Mr. Knecht's March 2018 letter stated that, "[t]he District will need to develop and submit to Memphis for its review a detailed plan of action for the removal of its users from Memphis' sanitary sewer system along with a proposed schedule within the next six (6) months from the date of receipt of this letter." (ECF No. 1-9 at PageID 34; ECF No. 91-2, ¶ 61.)

62.     Mayor Jim Strickland confirmed Memphis' position on October 10, 2018 and October 29, 2018 by letters to the mayors of Horn Lake, Mississippi and Southaven, Mississippi. (ECF No. 1-10; ECF No. 91-2, ¶ 62.)

63.     The District's current commissioners had never seen the parties' contract prior to receiving Mr. Knecht's letter in March 2018.  (ECF No. 90-2, ¶ 63.)

64.     The District did not provide a "detailed plan of action for the removal of its users from Memphis' sanitary sewer system" within six (6) months of receipt of Mr. Knecht's letter and instead provided an overview of the "[p]lanning level assessments" it "made to identify treatment options the District could potentially pursue" to provide alternative wastewater treatment services to its customers approximately fifteen (15) months later.  (ECF No. 1-12 at PageID 45-46; ECF No. 90-2, ¶ 65.)

65.     The District's letter did not identify any concrete plans of action for the removal of the District's users from the City's sanitary sewer system.  (*See* ECF No. 1-12 at PageID 45-46; ECF No. 90-2, ¶ 66.)

66.     Under the 1975 Agreement, Memphis is required to accept, treat, and dispose of wastewater collected by the District and delivered to Memphis.  (ECF No. 1-6 at PageID 22; ECF No. 91-2, ¶ 67.)

67.     Memphis continues to this day to accept, treat, and dispose of the wastewater collected by the District in accordance with the terms of the 1975 and 1983 Agreements.  (ECF No. 91-2, ¶ 68.)

68.     Memphis has never indicated that it will stop accepting, treating, and disposing of the District's wastewater before September 22, 2023.  (*Id.*, ¶ 69.)

## PROPOSED CONCLUSIONS OF LAW

1.     The City's claim for declaratory judgment requires the Court to interpret two provisions of the parties' wastewater-treatment agreement.  First, the City asks the Court to interpret paragraph 8 of the 1983 Agreement dealing with the durational term of the contract and declare that the agreement expires by its own terms after forty years, on September 22, 2023.

2.     Second, the City asks the Court to construe paragraph 11 of the 1975 Agreement and declare that the City is not contractually obligated to negotiate a renewal of the wastewater-treatment agreement or to negotiate a new contract with the Defendants.

## I.     Tennessee Law Applies

3.     "It is well-established that, in a diversity case such as this one, a federal court must apply the substantive law of the state in which the court sits."  *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002) (citation omitted).  This rule also requires the court to apply the choice of law rules of the forum state.  *Id.* (citation omitted).  The Court must, therefore, apply the choice of law rules of Tennessee to this case.

4.     Under Tennessee law, it is presumed "that the construction and validity of a contract are governed by the law of the place where the contract is made."  *Winebrenner v. Godwin*, 2019 WL 1856471, at *3 (Tenn. Ct. App. April 25, 2019) (quoting *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W. 2d 465, 466 (Tenn. 1973)).

5.     Tennessee law applies to the interpretation of the parties' contract.  First, the Memphis City Council ratified the 1975 Agreement in Tennessee.  (*See* ECF No. 91-2, ¶ 46.)  The agreement was therefore executed in Tennessee.  Second, the agreement calls for the vast majority of the performance to take place in Tennessee.  For example, the 1975 Agreement requires the City to provide sewage treatment services to the District at the City's wastewater treatment plant

in Tennessee.  (ECF No. 1-6 at PageID 22.)  The 1975 Agreement also requires the District to transport its wastewater to the metering station in Tennessee, requires the treated wastewater to be disposed of in Tennessee, and requires the District to pay the City in Tennessee.  (*Id.*)  Thus, the place of all relevant and material performance is Tennessee.

## II.     The Wastewater Treatment Agreement Unambiguously Expires by Its Own Terms After Forty Years

6.     A contract's "words are the most reliable indicator—and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute."  *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W. 3d 671, 694 (Tenn. 2019) (quoting Feldman, 21 Tenn. Practice § 8:14.) Here, the words of the wastewater treatment agreement clearly establishes that the parties entered into a forty-year contract.  The plain language of the contract shows that its "effective duration" is forty years from the date the 1983 Agreement was executed.

7.     Under Tennessee law, the "cardinal rule" of contract interpretation is to "ascertain and give effect to the intent of the contracting parties consistent with legal principles."  *Individual Healthcare*, 566 S.W. 3d at 688 (collecting cases).  Further, the rules of contract interpretation "have their sole object 'to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it *at the time it was made*.'"  *Id*. (emphasis added) (quoting *McNairy v. Thompson*, 33 Tenn. 141, 149 (1853)).  Since the interpretation of a contract focuses on the intent of the parties at the time of contracting, "the parties cannot use the courts as 'a fallback mechanism . . . to make a new contract' when, under the circumstances, they suddenly become dissatisfied with their agreement."  *Raley v. Brinkman*, 621 S.W. 3d 208, 245 (Tenn. Ct. App. 2020) (quoting *Individual Healthcare*, 566 S.W. 3d at 694).

8.     In ascertaining the intent of the parties, "Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation." *Individual Healthcare*, 566 S.W. 3d at 694.  The words used in the contract "should be given the usual, natural, and ordinary meaning." *Strategic Acquisitions Grp., LLC v. Premier Parking of Tenn., LLC*, No. E2019-01631-COA-R3-CV, 2020 WL 2595869, at *4 (Tenn. Ct. App. May 22, 2020) (quoting *Fisher v. Revell*, 343 S.W. 3d 776, 779 (Tenn. Ct. App. 2009)).  Further, "[i]f the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties." *Id*.

### A.     The parties' wastewater treatment agreement is a contract for a definite term that end on September 22, 2023.

9.     The Court's "initial task in construing the contract is to determine whether the language is ambiguous." *Bakers Const. Servs., Inc. v. Greeneville-Greene Cty. Airport Auth.*, No. E2014-01395-COA-R3-CV, 2015 WL 2258423, at *11 (Tenn. Ct. App. May 4, 2015) (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W. 3d 885, 889-90 (Tenn. 2002)).  "In general terms, an ambiguity occurs where a word or phrase is capable of more than one meaning when viewed in the context of the entire agreement by an objective and reasonable person." *Id*. (citation omitted).

10.    Here, the 1983 Agreement provides that, "the *effective duration* of the February 5 (sic), 1975 Agreement . . . shall be extended for a period of forty (40) years from the date of execution of this Supplemental Agreement." (ECF No. 1-8 at PageID 30.)  The term "effective" is an adjective that means "in operation at a given time." *Effective*, Black's Law Dictionary (11th ed. 2019).  And "duration" means "the length of time something lasts." *Duration*, Black's Law Dictionary (11th ed. 2019).  Therefore, the phrase "effective duration" means the length of time something is in operation.

11.     For these reasons, the 1983 Agreement clearly provides that the length of time the parties' contract will remain in operation is forty years from the date the 1983 Agreement was executed.

12.     Further, notice is not required when a contract expires by its own terms without the action of either party.  *See, e.g.*, *Wayland-Goodman Properties, LP. v. Southside Package Store, Inc.*, No. E200901550COAR3CV, 2010 WL 1404399, at *2 (Tenn. Ct. App. Apr. 8, 2010) (holding that notice to vacate was not required under a lease agreement that terminated on a date certain); *Munford Union Bank v. Am. Ambassador Cas. Co.*, 15 S.W. 3d 448, 454 (Tenn. Ct. App. 1999) (holding that notice of the expiration of an insurance policy was not required when the insurance contract expressly referenced the policy period).  A notice provision would, therefore, be unnecessary in this situation because all parties were already on notice of when the agreement naturally expires.

13.     Defendants' subjective intent that the parties' contract would not expire after forty years cannot overcome the unambiguous terms of the 1983 Agreement.  *See CMH Mfg., Inc. v. GKD Mgmt., LP*, 2020 WL 3485339, at *7 (E.D. Tenn. April 9, 2020) (collecting cases).  "An unambiguous contract must be enforced as written regardless of the subjective intentions of the parties."  *Davis v. Sliney*, No. 16, 1988 WL 75331, at *2 (Tenn. Ct. App. July 21, 1988) (citations omitted).

14.     For all these reasons, the Court must enforce the parties' contract as it is written.  The 1983 Agreement unambiguously provides that the "effective duration" of the contract is forty years.  (ECF No. 1-8 at PageID 30.)  Therefore, there is only one conclusion to draw: the parties' wastewater-treatment agreement expires by its own terms after forty years, on September 22, 2023.

**B.**     **Parol evidence is not admissible to supplement or contradict the unambiguous terms of the contract.**

15.     Furthermore, parol evidence cannot be introduced to supplement or contradict the unambiguous duration of the contract.  At its core, the parol evidence rule prohibits the use of extrinsic evidence to contradict or vary the terms of a written contract.  *Individual Healthcare*, 566 S.W. 3d at 695.  The "parol evidence rule is most restrictive when the contract at issue is fully or completely integrated . . . ."  *Id.* (citation omitted).  "When a contract is fully integrated, the parol evidence rule does more than prohibit the use of pre-contract negotiations to contradict the contract's terms; it also prohibits the use of pre-contract negotiations within *the scope of* the agreement in a way that would *supplement or limit* its terms, even if that evidence is consistent with the written terms of the contract."  *Id.* (emphasis in original) (citation omitted).  On the other hand, a partially integrated contract "may not be contradicted by parol evidence, but may be supplemented by consistent additional terms . . . ."  *Id.* (quoting Feldman, 21 Tenn. Practice § 8:50).

16.     A fully integrated contract is one that the parties adopted "as a complete and exclusive statement of the terms of the agreement."  *Schaeffer v. Am. Honda Motor Co., Inc.*, 976 F. Supp. 736, 741 (W.D. Tenn. 1997) (quoting Restatement (Second) of Contracts § 210 (1981)).  Importantly, "even if a contract does not actually contain an integration clause, that does not necessarily mean that it is not a fully integrated contract."  *Adams v. Delk Indus., Inc.*, No. 3:19-CV-00878, 2021 WL 354096, at *10 (M.D. Tenn. Feb. 2, 2021).  Instead, "[w]hether the parties intended the writing as the final expression of their agreement is determined in the first instance from the writing itself.  If a document appears to be a complete agreement on its face, it is conclusively presumed to be a final, complete agreement."  *Id.* (quoting Feldman, 21 Tenn. Practice § 8:49).

15

17.     In this case, the wastewater-treatment agreement is a written contract that contains the final and complete expression of the parties' agreement.  (*See* ECF Nos. 1-6 and 1-8.)  Although the parties' contract does not contain an integration clause, it is unambiguous on its face and contain all the terms of the parties' agreement.  *See* Feldman, Tenn. Practice § 8:48.  Therefore, the wastewater-treatment agreement is "conclusively presumed to be a final, complete agreement." *Adams*, 2021 WL 354096, at *10 (quoting Feldman, Tenn. Practice § 8:49).

18.     Therefore, Defendants cannot rely on parol evidence to either contradict or supplement the contract's terms.  The 1983 Agreement unambiguously states that the "effective duration of the [1975 Agreement] as modified by this Supplemental Agreement shall be extended for a period of forty (40) years" from the date of execution of the 1983 Agreement.  (ECF No. 1-8 at PageID 30.)  There is no evidence that could be introduced in an attempt to prolong the duration of the contract (i.e., "supplement" its terms) without simultaneously contradicting its express terms.

19.     For these reasons, Defendants cannot use parol evidence to evade the forty-year term of the parties' agreement.

**C.     Tennessee Code Annotated § 7-51-902 prohibits Memphis from entering into a contract related to capital improvement property for longer than a forty-year term.**

20.     What is more, Tennessee law limits municipal contracts such as the wastewater-treatment agreement to "terms not to exceed forty (40) years or the useful life of the subject capital improvement property, whichever is less."  Tenn. Code Ann. § 7-51-902.  The Tennessee Supreme Court has "recognized that municipal governments in Tennessee derive the whole of their authority solely from the General Assembly . . . ."  *Arnwine v. Union Cty. Bd. of Educ.*, 120 S.W. 3d 804, 807 (Tenn. 2003) (quoting *S. Constructors, Inc. v. Loudon Cty. Bd. of Educ.*, 58 S.W. 3d 706, 710

(Tenn. 2001)).  Therefore, "absent some indication to the contrary, the General Assembly must be presumed to have endowed local governments with only as much authority as it granted through the language of its delegation."  *Id.* (quoting *S. Constructors, Inc.*, 58 S.W. 3d at 712).  To that end, the City's ability to enter into the wastewater-treatment agreement for any period of time is limited by the authority delegated to the City by the Tennessee General Assembly.

21.     "Capital improvement property" is any "real or tangible property needed for a governmental purpose and having a useful life of one (1) year or more, and any real or tangible personal property with respect to which capital outlay notes can be legally authorized and issued by a municipality."  Tenn. Code Ann. § 7-51-901(1).  Accordingly, the Horn Lake Interceptor and the T. E. Maxson WWTP are capital improvement property.  *See* Tenn. Code Ann. § 7-51-907 (providing that "sewage treatment works" are capital improvement property).

22.     Tennessee law therefore limits the duration of the contract to forty years or less. The City was, and still is, unable to enter into a contract related to capital improvement property for longer than a forty-year term.  *See Allmand v. Pavletic*, 292 S.W. 3d 618, 626 (Tenn. 2009) (holding that "[w]hen a municipality fails to act within its charter or under applicable statutory authority, the action is ultra vires and void or voidable.") (quoting *City of Lebanon v. Baird*, 756 S.W. 2d 236, 241 (Tenn. 1988)).

23.     Therefore, not only does the parties' contract unambiguously provide for a definite term of forty years, but Tennessee law also prohibits the enforcement of any contract related to the Horn Lake Interceptor and the T. E. Maxson WWTP for longer than forty years.

**III.    Memphis is Not Contractually Obligated to Negotiate a New Sewage Treatment Agreement with the District.**

24.     Nor is there a contractual obligation on the part of the City to renew the wastewater treatment agreement or negotiate a new contract with Defendants.  The only provision that

Defendants cite in support of this argument is a provision of the 1975 Agreement that states, "at the expiration of said time shall be subject to review and change agreeable to both parties." (*See* ECF No. 1-6 at PageID 25, ¶ 11.) This is not enough to obligate the City to continue treating the District's wastewater beyond the effective duration of the contract.

### A.   The wastewater treatment agreement does not contain an enforceable promise to negotiate a renewal or new sewage treatment agreement.

25.   There is no enforceable contractual obligation requiring the City to continue treating the District's wastewater beyond September 22, 2023.

26.   "In order for a contract to be binding it must spell out the obligation of the parties with sufficient definiteness that it can be performed." *Four Eights, LLC v. Salem*, 194 S.W. 3d 484, 487 (Tenn. Ct. App. 2005) (quoting *United Am. Bank of Memphis v. Walker*, 1986 WL 11250, at *2 (Tenn. Ct. App. Oct. 10, 1986)). For that reason, no material term may be left for the parties to agree upon during future negotiations. *Id*. "The contract terms must be 'sufficiently definite to enable a court to give it an exact meaning.'" *LVH, LLC v. Freeman Investment, LLC*, No. M2020-00698-COA-R3-CV, 2021 WL 1943370, at *3 (Tenn. Ct. App. May 14, 2021) (quoting *United Am. Bank of Memphis*, 1986 WL 11250, at *1).

27.   "It is a fundamental rule of law that an alleged contract which is so vague, indefinite and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable. Consequently[,] where substantial and necessary terms are specifically left open for future negotiations, the purported contract is fatally defective." *Id*. Therefore, "[t]he so-called 'contract to make a contract' is not a contract at all." *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W. 3d 637, 644 (Tenn. Ct. App. 2006) (quoting *Engenius Entm't, Inc. v. Herenton*, 971 S.W. 2d 12, at 18 (Tenn. Ct. App. 1997)).

28.     In this case, the only provision Defendants point to as creating some obligation beyond the effective duration of the contract leaves open all of the material and essential terms to be agreed upon during *future* negotiations.   These open terms include, but are not limited to, the price terms, duration, conditions of collection and treatment, reciprocal covenants, and influent limitations that would have to be mutually agreed upon by the parties before any binding contract could be made.   At bottom, this provision does not define any of the material or essential terms as is required to create a binding agreement.   It is merely an invitation to enter into a future contract, which is itself not an enforceable agreement under Tennessee law.

29.     Therefore, the wastewater-treatment agreement does not include a binding promise to negotiate a renewal or new contract.

**B.     Memphis does not owe Defendants a duty to negotiate in good faith.**

30.     There is also no enforceable contractual provision requiring the City to negotiate a renewal or new sewage treatment agreement with the District.   Nor does the duty of good faith and fair dealing require the City to negotiate a future agreement with the District.

31.     On this issue, Tennessee law holds that "a duty to negotiate in good faith does not arise 'absent an express contractual agreement.'"   *LVH, LLC*, 2021 WL 1943370, at *6 n.3 (quoting *Barnes & Robinson Co., Inc.*, 195 S.W. 3d at 644).   Courts interpreting Tennessee law routinely reject the argument that parties are required to negotiate in good faith in the absence of an express contractual agreement to do so.   *See, e.g.*, *N.D. Mgmt., Inc. v. Hawkins*, No. 3:18-cv-00890, 2019 WL 266715, at *5 (M.D. Tenn. Jan. 18, 2019); *Johnson v. Synovus Bank*, No. 2:14-cv-29509STA-dkv, 2015 WL 4041648, at *8-9 (W.D. Tenn. July 1, 2015); *S.K. Servs. v. FedEx Ground Package Sys., Inc.*, No. 1:08-CV-158, 2008 WL 5204067, at *3 (E.D. Tenn. Dec. 11, 2008); *Barnes & Robinson*, 195 S.W. 3d at 644.

32.     For example, in *Watkins & Son Pet Supplies v. Iams Company*, the Sixth Circuit ruled that a contract did not contain an implied duty to negotiate a renewal in good faith, because "it appear[ed] from the face of the contract that none of the terms of the proposed renewal had been agreed upon." 254 F.3d 607, 615 (6th Cir. 2001). The renewal provision at issue in *Watkins & Son Pet Supplies* stated that, "[t]his Agreement may be renewed thereafter on terms mutually agreeable to the parties . . .." *Id.* at 610. The Sixth Circuit found that this provision did not show a "promise to make a deal on which [the plaintiff] reasonably could have relied, [and] the court will not allow recovery." *Id.* at 615 (citation omitted).

33.     In this case, the contract does not contain an "express contractual agreement" requiring the City to negotiate in good faith. And, even if they did, they would be unenforceable for lack of definiteness.

### C.     Equitable considerations cannot override the express terms of the parties' contract.

34.     Finally, Tennessee law does not allow equitable considerations to override the express terms of the parties' agreement.

35.     "The courts should tread cautiously when asked to recognize and enforce implied obligations that are not reflected in a written contract." *Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W. 3d 653, 673 (Tenn. 2013) (William, J. concurring). To that end, "[e]quitable considerations cannot intervene in a pure breach of contract action." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W. 3d 1, 26 (Tenn. Ct. App. 2005). "Equity follows the law. Where there is no legal liability, equity can create none." *Id.* (quoting *Henderson v. Overton*, 10 Tenn. 394, 397 (1830)). "What appears to be fair as a matter of equity cannot prevail in the face of constitutional, statutory or contractual provisions governing the rights of the parties." *Id.* Therefore, "[t]he rights of the parties are to be determined from the contracts into which they

entered and the consequences of those contracts and not the generalized concepts of equity." *Id.* (quoting *Norcomo Corp. v. Franchi Const. Co., Inc.*, 587 S.W. 2d 311, 317 (Mo. Ct. App. 1979)).

36.   There is no contractual obligation requiring the City to continue treating the District's wastewater beyond the expiration date of the contract.  Therefore, equitable considerations cannot be used to impose an extra-contractual duty on the City to continue accepting and treating the District's wastewater.

37.   Further, the Court cannot create a new contract simply because the negotiated terms of the parties' agreement have now become disadvantageous in Defendants' view.  *See Baptist Mem'l Hosp. v. Argo Cont. Corp.*, 308 S.W. 3d 337, 345 (Tenn. Ct. App. 2009).

## IV.    Conclusion

38.   IT IS THEREFORE ORDERED that the City's request for declaratory judgment is GRANTED and Defendants' claims are DENIED.

39.   It is further ORDERED that:

   a.   The parties' wastewater-treatment agreement unambiguously expires by its own terms forty years after the execution of the 1983 Agreement.

   b.   The parties' wastewater-treatment agreement is a contract for a definite term that ends on September 22, 2023.

   c.   After the expiration of the contract on September 22, 2023, the City of Memphis does not owe any additional duties or obligations to Defendants.

   d.   Defendants are not entitled to any relief from the City of Memphis.

   e.   The City may move for further relief based on this declaratory judgment under 28 U.S.C. § 2202 if it so chooses.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

s/Pete A. Brunson
_____
Carmalita Carletos-Drayton (TN #20001)
Bruce A. McMullen (TN #18126)
Mary Wu Tullis (TN #31339)
Pete A. Brunson (TN # 37109)
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone:     901.526.2000
Facsimile:     901.577.2303
ccdrayton@bakerdonelson.com
bmcmullen@bakerdonelson.com
mtullis@bakerdonelson.com
pbrunson@bakerdonelson.com