IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

___

CITY OF MEMPHIS,

    Plaintiff,

v.                                                         Case No. 2:19-cv-2864-MSN-cgc

HORN LAKE CREEK BASIN INTERCEPTOR
SEWER DISTRICT and
DESOTO COUNTY, MISSISSIPPI,

    Defendants.

___

**ORDER GRANTING IN PART AND DENYING IN PART THE CITY OF MEMPHIS' MOTION TO ALTER OR AMEND FINDINGS AND JUDGMENT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR RELIEF FROM JUDGMENT**

___

Before the Court are the City of Memphis' ("City" or "Memphis") Motion to Alter or Amend Findings and Judgment or, in the Alternative, for a New Trial or Relief from Judgment (ECF No. 155, "Motion") with a supporting memorandum (ECF No. 156), and the Horn Lake Creek Basin Interceptor Sewer District's ("District") response in opposition to the Motion. (ECF No. 158.)  For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

A nonjury trial in this matter took place over five days in April and May, 2023.  In September 2023, the Court entered its Memorandum Opinion and Order setting forth its findings of fact and conclusions of law and equity (ECF No. 153, "Memorandum Opinion").   The City's Motion moves the Court to alter or amend its findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(b) and 59(e).  Specifically, the City asserts that the Court

should alter or amend its findings and conclusions because (1) the Court failed to consider the City's Sewer Use Ordinance when deciding whether the District should be required to enter into an agreement with the City to continue discharging its wastewater to the City after expiration of the previous agreement (*see* ECF No. 153 at PageID 2517–20, 2567–71); (2) the Court's rate structure does not require the District to pay its proportionate share of the costs to operate and maintain the City's entire sanitary sewer system; and (3) the District's customers should be required to pay a sewer development fee. Alternatively, the City's Motion moves for a new trial or relief from the judgment on these issues pursuant to Rules 59(a) and 60(b).

## STANDARD OF REVIEW

**A.     Alter or Amend Findings or Judgment**

Rule 52(b) provides as follows:

> **(b) Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b).

Relief under Rule 52 is available only on "a showing of manifest error of fact or law by the trial court, newly discovered evidence, or a change in the law." *Adams v. Baker*, No. 1:16-cv-335, 2020 WL 406946, at *2, 2020 U.S. Dist. LEXIS 11984 at *6 (E.D. Tenn. Jan. 24, 2020). It "is not intended to serve as a vehicle for a rehearing." *Roberts v. Bailar*, 538 F. Supp. 424, 428 (E.D. Tenn. 1980); *see Adams*, 2020 WL 406946, at *2 ("Rule 52(b) does not allow parties to relitigate the merits of a case or to advance new issues or theories.").

Similarly, Rule 59(e) authorizes the Court to alter or amend a judgment. Doing so, however, "is an extraordinary measure, and motions requesting such amendment are sparingly granted." *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, No. CV 12-91-GFVT, 2016 WL

7971208, at *1 (E.D. Ky. Feb. 9, 2016) (cleaned up). Like Rule 52(b), "a Rule 59(e) motion should be based on (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Stephens v. Nat'l City Corp.,* No. 20-3746, 2021 WL 3027864, at *4 (6th Cir. June 14, 2021) (cleaned up); *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 841 (6th Cir. 2018); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999). A clear error of law "is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Zillow, Inc. v. Bork*, No. 3:19-cv-00049-GFVT, 2023 WL 2378931 at *1, 2023 U.S. Dist. LEXIS 36668 at *5 (E.D. Ky. Mar. 3, 2023) (quoting *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000)). Manifest injustice occurs when the trial court makes an error that is "direct, obvious, and observable," or, put differently, "is apparent to the point of being indisputable." *Bluewater Music Servs. Corp. v. Spotify USA Inc.*, No. 3:17-CV-01051, 2019 WL 6894518, at *3 (M.D. Tenn. Mar. 25, 2019). The error "must be so patently unfair and tainted that the error is manifestly clear to all who view it." *Id.* Whether to grant a Rule 59(e) motion is generally a matter within the district court's discretion. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998); *see Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002).

**B.**     **New Trial or Relief from Judgment**

Under Rule 59(a), a court may "grant a new trial on all or some of the issues" following a nonjury trial "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. P. 59(a)(1)(B). Additionally, "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2). "A motion for a new trial in a nonjury case or petition for

3

rehearing should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *Tam v. Harrah's Tunica Corp.*, No. 08-2813-STA-cgc, 2012 WL 2681810, at *3 (W.D. Tenn. July 6, 2012) (citing *Risher v. United States*, No. 08-2249, 2011 WL 1626776, at *1 (W.D. Tenn. Apr. 28, 2011)). "Because they upset a trial's outcome, new trial motions are generally disfavored and should be awarded with great caution." *Id.* (quoting Steven F. Baicker-McKee et al., Federal Civil Rules Handbook 1124 (2010)). "The decision to grant the new trial lies within the sound discretion of the trial court." *Ky. Forward LLC v. Short*, No. 5:15-CV-6-JMH, 2017 WL 190092 at *3, 2017 U.S. Dist. LEXIS 6517, at *6 (E.D. Ky. Jan. 17, 2017) (quoting *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir. 1999)) (cleaned up).

Finally, under Rule 60(b), the Court is authorized to grant relief "from a final judgment, order, or proceeding" for any of the following specified reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  The standard under Rule 60(b) is significantly higher than the Rule 59(e) standard.  *See Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 268 (6th Cir. 1998).  Rule 60(b) is not intended to allow relief from judgment merely because a plaintiff is unhappy with the outcome.  *See Jinks v. AlliedSignal, Inc.*, 250 F.3d 381, 385 (6th Cir. 2001).  "A Rule 60(b)(1)

4

motion is intended to provide relief in only two situations: (1) when a party has made an excusable mistake or an attorney has acted without authority, or (2) when the judge has made a substantive mistake of law or fact in the final judgment or order." *United States v. Reyes*, 307 F.3d 451, 455 (6th Cir. 2002). Claims of legal error are properly considered under Rule 60(b)(1) as a type of mistake. *See Braggs v. Perez*, 42 F. App'x 678, 680 (6th Cir. 2002); *Pierce v. United Mine Workers of Am. Welfare and Ret. Fund for 1950 and 1974*, 770 F.2d 449, 451 (6th Cir. 1985). Rule 60(b)(6) "is a catchall provision, and a court should grant relief under this Rule only in exceptional or extraordinary circumstances where principles of equity mandate relief." *Kelmendi v. Detroit Bd. of Educ.*, 780 F. App'x 310, 312 (6th Cir. 2019) (quoting *Miller v. Mays*, 879 F.3d 691, 698 (6th Cir. 2018)) (cleaned up). "Relief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation." *Blue Diamond Coal Co. v. Trs. of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001).

## DISCUSSION

### A.   The City's Sewer Use Ordinance

The City asks the Court to alter its findings and judgment to require the District to enter a written agreement with the City that allows the City to enforce its pretreatment program requirements in accordance with the City's Sewer Use Ordinance. (*See* ECF No. 156 at PageID 2596–605.) If the Court does so, that would "trigger[] the Consent Decree's requirement that the City enter into an inter-jurisdictional agreement with the District consistent with the terms of the [IJAP]." (*Id.* at PageID 2599.) The City argues that "federal and state law require that the District enter into a written agreement with the City establishing binding procedures to ensure that industrial users located in the District are subject to the City's pretreatment program requirements." (*See id.* at PageID 2600.) The City asserts that the Court must therefore order the

parties to enter an agreement to "to remedy a clear error of fact and law," and "to prevent a manifest injustice that would result from the City's inability to comply with federal and state law." (*Id.* at PageID 2605.) According to the City, if the Court does not order the District to enter into such an agreement, the Court would be acting outside of its authority by "ignor[ing] the judgment of Congress, deliberately expressed in legislation." (*See id.* at PageID 2604.)

To begin, the Court was aware of and considered the requirements of the City's Sewer Use Ordinance ("SUO") when it made its findings and conclusions in the Memorandum Opinion.[1] The SUO was discussed in the City's briefing about the IJAP, (*see* ECF No. 127 at PageID 1524–27), and the City's proposed findings included several paragraphs about the SUO, including one proposed finding that "the District's failure to enter into [an agreement as required by the SUO] while still continuing to discharge sewage and wastewater to the City's sanitary sewer system would result in a violation of the Clean Water Act. *See* 33 U.S.C. § 1319." (*See* ECF No. 147 at PageID 2502–03, 2505–06, 2509, 2514–15.) The Court, however, was not convinced by the City's arguments. The City's Motion provides a more detailed explanation about why it believes an agreement is required; however, for reasons discussed later, the Court remains unmoved. Nevertheless, because the Court did not include specific findings or conclusions about the SUO in its Memorandum Opinion, the City's Motion under Rule 52(b) is **GRANTED IN PART** as to amended and additional findings as set forth below.

<u>First</u>, the Court **AMENDS** and **REPLACES** in its entirety its finding in Paragraph 44 under subtitle "**C. <u>The Consent Decree and IJA Program</u>**" as follows:

---

[1] (*See* ECF No. 153 at PageID 2531 n. 8 ("Not all testimony or evidence may be referenced; however, the Court has examined all submitted materials, weighed the credibility of witnesses, considered all admitted evidence, and reviewed the entire record in the case.").)

6

44. After consultation with the Tennessee Department of Environment and Conservation ("TDEC"), the EPA approved the City's revised IJA Program on March 19, 2018. (ECF No. 136 at PageID 1844; Exhibit 5.)

Second, the Court makes additional findings about the Sewer Use Ordinance as follows:

### L. The City's Sewer Use Ordinance

161. The City enacted its current Sewer Use Ordinance ("SUO") in September 2021. (*See* ECF No. 127 at PageID 1524.)

162. The City's SUO is an approved pretreatment program pursuant to 40 C.F.R. § 403.8. (*See* ECF No. 127 at PageID 1525.)

163. The State of Mississippi has assumed responsibility for implementing the Publicly Owned Treatment Works ("POTW") Pretreatment Program requirements in 40 C.F.R. § 403.8(f) in lieu of requiring POTWs to develop a Pretreatment Program. (*See* Exhibit 5 at COM_015047; *see also* ECF No. 127 at PageID 1523.)

164. The City's SUO provides for review and oversight of industrial users in "outlying jurisdictions," which the ordinance defines as "[a] city, town, county, district, association, or other public body created by or pursuant to state law in which an industrial user is located outside the Memphis City limits that discharges sewage and/or wastewater to a sewer system located in that jurisdiction, wherein the sewage and/or wastewater empties into the Memphis sewage system for eventual treatment at the Memphis WWTP(s). An "outlying jurisdiction" also includes a state that is approved pursuant to 40 C.F.R. § 403.10(e), that issues permits to industrial user(s) for discharging sewage and/or wastewater to a sewer system located in that state, wherein the sewage and/or wastewater empties into the Memphis sewage system for eventual treatment at the Memphis WWTP(s)." Memphis Municipal Code § 13-24-94(A).

165. The SUO provides, in part, that "No user shall introduce sewage or wastewater to the Memphis POTW, including to the sewers, pipes, and other conveyances that convey wastewater to the Memphis WWTP if . . . (4) The user is located in an outlying jurisdiction which does not have a written agreement with Memphis allowing the discharge of its users to the Memphis POTW. Memphis Municipal Code § 13-24-91(B). "User" is defined as "any person (including a waste hauler) that discharges wastewater or otherwise causes or permits wastewater to enter into the city's POTW, including, but not limited to, the sanitary sewer." Memphis Municipal Code §13-4-1.

166. The SUO also provides that nothing in the pretreatment chapter "shall be construed as prohibiting any special agreement or arrangement between the control authority and any person, or for the control authority to otherwise waive requirements herein, when conditions and circumstances making such

7

special agreement(s), arrangement(s), or waiver(s) advisable and/or necessary, in the opinion of the control authority, are present. In no event shall special agreement(s), arrangement(s), or waiver(s) permit any industrial user to violate applicable minimum Federal or State pretreatment requirements (e.g., National Categorical Pretreatment Standards) as set forth in 40 C.F.R. Part 403 and Rule 1400-40-14." Memphis Municipal Code § 13-24-101.

167. In December 2019, Mr. Knecht sent a letter to Jeaneanne Gettle, Director, Water Management Division of the EPA. (*See* ECF No. 127-3.) That letter was a follow-up to a conference call hosted by the EPA in October 2019, in which the City sought the EPA's assistance to resolve issues between it and MDEQ about pretreatment issues related to industrial users located in the District. (*See* ECF No. 127-3.)

168. Mr. Knecht's December 2019 letter stated that at the top of the City's list of concerns was the City's ability to inspect and enforce against industrial users in Mississippi and MDEQ's position that it would not delegate enforcement authority to the City. (*See* ECF No. 127-3 at PageID 1617.)

169. Mr. Knecht's December 2019 letter further noted that the City was concerned, based on its discussions with TDEC, that Tennessee law required the City to have the ability to enforce its pretreatment requirements. (*See* ECF No. 127-3 at PageID 1619–20.)

170. Mr. Knecht's December 2019 letter then discussed several concerns the City had based on state or local pretreatment requirements that were more stringent than federal law. The letter pointed out that "Section 510 of the Clean Water Act, 33 U.S.C. § 1370, specifically reserves the rights of states and municipalities to impose requirements that are more stringent than the federal minimum requirements," and asserted that Tennessee's and the City's "more stringent requirements should also be imposed upon Mississippi [industrial users] discharging to Memphis." (ECF No. 127-3 at PageID 1620.) Later, the letter points out that the MDEQ permits issued to industrial users that discharge to the City contained "the less stringent federal standard," and were also missing a multitude of other more stringent Memphis prohibitions set forth in its then in-effect SUO. (*Id.* at PageID 1622–24.)

171. Mr. Knecht's December 2019 letter also specifically pointed out the City's concerns about its local limits not being included in the permits MDEQ issued to industrial users in the District, and it listed specific permits and issues. In a footnote, the City further noted that the local limits it adopted pursuant to 40 C.F.R. §§ 403.5(c) and (d) are deemed Pretreatment Standards for the purposes of Section 307 of the Clean Water Act. (*See* ECF No. 127-3 at PageID 1624–25, 1624 n.15.)

8

Third, the Court makes the following additional conclusions of law and equity about the City's Sewer Use Ordinance:

The Court is also not convinced that it should order the parties to enter into an agreement based on the requirements in the City's SUO.  For background, the Clean Water Act's ("CWA") objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One way the CWA accomplishes that objective is to prohibit any person from discharging pollutants into the navigable waters of the United States, except discharges in compliance with, *inter alia*, Section 307 of the CWA.  *See* 33 U.S.C. § 1311(a). Under the authority of Section 307, the EPA has promulgated pretreatment regulations with prohibitions and limits on specified pollutants from certain industrial dischargers that are meant to ensure that a Publicly Owned Treatment Works ("POTW") can comply with its NPDES permit.  *See* 40 C.F.R. §§ 403.1, 403.2, and 403.5.  The regulations require certain POTWs to develop "Pretreatment Programs."  40 C.F.R §§ 403.8(a) and (f).  The POTW's Pretreatment Programs must provide for the issuance of permits or equivalent individual control mechanisms for certain defined industrial users. 40 C.F.R § 403.8(f)(1)(iii) ("Significant Industrial User"); *see* 40 C.F.R. § 403.3(v)(1)(ii) (definition of "Significant Industrial User").  In addition, § 403.5(c) authorizes the POTW to establish "local limits," and under § 403.5(d), such local limits constitute pretreatment standards that are federally enforceable under Section 307(d) of the CWA, 33 U.S.C. § 1317(d).  *See* 40 C.F.R. §§ 403.5(c) and (d).  However, a POTW is not required to establish a Pretreatment Program when "the NPDES State exercises its option to assume local responsibilities as provided for in § 403.10(e)." *Id.* at § 403.8(a).  Under Section 403.10(e), "[n]otwithstanding the provision of § 403.8(a), a State with an approved Pretreatment Program may assume responsibility for implementing the POTW's Pretreatment Program requirements set forth in § 403.8(f) in lieu of requiring the POTW to develop a Pretreatment Program." 40 C.F.R. § 403.10(e).

Here, the City is required to develop and enforce a Pretreatment Program in accordance with § 403.8(a).  And, indeed, this is reflected in Part II, Paragraph B.2 of the IJAP, which explains that:

> Memphis is required to implement and enforce a pretreatment program to control discharges from industrial users to its WCTS [Waste Collection and Transmission System] pursuant to requirements set out in the Federal Clean Water Act, 42 U.S.C. § 1251 *et seq.*, and the rules and regulations promulgated thereunder, including 40 C.F.R. Part 403, and the Tennessee Code Annotated 68-3-101, as now stated and as may hereafter be amended. **[Insert name of satellite municipality]** hereby agrees to adopt a sewer use ordinance that subjects the industrial users served by the **[insert name of satellite municipality]** sewer system connected to the Memphis WCTS to the necessary pretreatment controls, and

9

> Memphis is authorized to implement and enforce that section of the **[insert name of satellite municipality]** sewer use ordinance pertaining to the pretreatment program for industrial dischargers.

(*See* Exhibit 5 at COM_015048.)

But the City also treats wastewater from industrial users located in Mississippi, which has elected to assume responsibility for implementing the Pretreatment Program requirements pursuant to § 403.10(e). And this is where things get complicated because it appears that the POTW Pretreatment Programs under § 403.8(a) and state-approved Pretreatment Programs under § 403.10 are usually alternative means to satisfy the Pretreatment Program requirements. The regulations do not appear to contemplate the specific circumstances here. The Court has not found, and the City did not point out, any guidance about how the Pretreatment Program regulations coordinate under such circumstances. In addition, although MDEQ's pretreatment permit rules generally adopted the regulations in 40 C.F.R. Part 403, they specifically did not adopt § 403.5(c) and (d), which provide for the development and enforcement of local limits. *See* 11-006 Miss. Code R. § 01.1.1.M  In the past, it appears the City has sought to work with MDEQ directly to resolve some of these issues. For example, in a letter to MDEQ dated April 26, 2018, Joshua Ballentine, Industrial Monitoring Manager with the City's Division of Public Works, explained that the "City of Memphis understands the State of Mississippi is a 403.10(e) state, and therefore implements the local pretreatment programs in lieu of municipalities. However, the City of Memphis believes that certain permit violations may arise, which MDEQ may not be aware of such as slug discharges which result in pass through and/or interference with its POTW operations. Therefore, the City of Memphis requests that MDEQ and the City of Memphis develop a formal agreement or memorandum of understanding with respect to its individual enforcement authority." (*See* Exhibit 7 at COM_000620.)

Regulatory confusion aside, Mr. Knecht's December 2019 letter shows that the EPA has been aware for years that (1) the City is unable to inspect or take enforcement action against industrial users in the District, and (2) the City's more stringent pretreatment limits are not being imposed in MDEQ permits issued to industrial users in the District. Yet, there is nothing in the record showing that the EPA has taken any action despite the City not having the authority it claims it is required to have under § 403.8.

Moreover, after consultation with TDEC, the EPA approved the City's IJA Program, and the IJAP's minimum provisions do not give the City enforcement authority over industrial users located in the District. The IJAP explains that Part II about pretreatment "does not address municipalities located in Mississippi, *i.e.*, a State that has a 40 C.F.R. § 403.10(e) program." (*Id.* at COM_015047.) The City claims it discovered issues with MDEQ's "implementation of pretreatment requirements" after the IJAP was approved, yet the record does not show that the

10

City has since sought to modify the IJAP to have Part II apply to municipalities located in Mississippi.

Without more, the Court is not convinced that the City's SUO requires the Court to order that the District enter an agreement with the City giving the City pretreatment enforcement authority, even though the City's SUO is an approved pretreatment program under § 403.8.

In light of the Court's additional findings, it may be obvious why the Court remains unmoved by the City's Motion, but a few things are worth mentioning. First, the City's Motion focuses on the requirements of § 403.8(f), but those same requirements are also set forth in § 403.10(f). The City cites no authority supporting that the requirements imposed on it in § 403.8(f) control in the unusual circumstances here. Second, the letter from TDEC does little to move the needle on the issue. As the City recognizes, Tennessee's regulations incorporate the pretreatment program requirements of § 403.8(f). (*See* ECF No. 156 at PageID 2597.) Thus, for the reasons outlined in the additional findings, the Court remains skeptical that the circumstances are as urgent as the City portrays. Finally, the City argues that the IJAP provides only the minimum requirements applicable to new or renewed agreements, and "Federal and state law fill in the IJA Program's gap concerning pretreatment, and the law requires that the City maintain the authority to enforce its pretreatment program limits over *any* industrial user that discharges its wastewater to the City's WWTP." (ECF No. 156 at PageID 2604–05.) Candidly, the Court is unsure what the City is asserting.[2] Nevertheless, the argument does not explain the IJAP's differential treatment of municipalities in Mississippi in a way that convinces the Court that it must order the District to enter an agreement with the City. The City's Motion is therefore **DENIED** as to any relief under Rules 59(e), 59(a), and 60(b).

---

[2] For example, if federal and state law "fill in the IJA Program's gap concerning pretreatment," then why does the IJAP include a section on pretreatment at all?

11

B.      **The District's Volumetric Rate**

The City seeks a revised rate structure "to remedy a manifest error of fact and law concerning the rate required to adequately compensate the City for its services, and to prevent manifest injustice that will result if the City is required to continue providing wastewater services to the District at rates that are insufficient to account for the District's proportionate share of the operation and maintenance of the City's entire sanitary sewer system." (ECF No. 156 at PageID 2610.) This argument without merit. The Court fully considered the City's arguments and evidence discussed in the Motion when it formulated the graduated rate structure set forth in its Memorandum Opinion. (*See* ECF No. 153.) Nothing in the Motion persuades the Court that it should alter or amend the rate structure. The City's request to change the graduated rate structure, including changing the date on which the District begins paying the greater of the City's ordinance rate or the applicable sewer rate then in effect and charged by DCRUA, is **DENIED**.[3] Similarly, the City's request for a new trial on this issue is **DENIED**.

There is one thing, however, that may merit clarification, if not amendment. The City asserts, in a footnote, that it is unsure whether it may calculate the "Agreements Rate" in October or November following the end of each fiscal year as it has typically done to calculate the District's rate under the Agreements, referencing Exhibit 11 from trial.[4] (*See* ECF No. 156 at PageID 2605

---

[3] Although not relevant to the Court's determination, the Court also thinks it would be inappropriate to impose the $1.60 cost of service study rate from the Shambaugh & Michelfelder Final Report beginning on September 23, 2023, when the Shambaugh & Michelfelder Final Report determined that rate for the "test year 2025."

[4] In other words, the parties have been calculating the District's rate for each fiscal year four to five months after the close of that fiscal year. For example, Exhibit 11 from trial is a letter dated October 31, 2022, and shows the calculations for the District's rate for July 1, 2021, to June 30, 2022. In its Memorandum Opinion, the Court cited Exhibit 11 to explain why the Court set rates based on a July 1st to June 30th year and noted that "the parties appear to have set rates previously based on the City's fiscal year." (*See* ECF No. 153 at PageID 2576 & n. 26.)

n.7.)  Neither the Court's Memorandum Opinion nor its Judgment direct <u>when</u> the parties must calculate the District's rate.  Nevertheless, the City says this uncertainty means the District will continue paying $0.96 per 1,000 gallons until July 1, 2024.  (*See id.* at PageID 2605.)  Curiously, however, the City's Motion does not move the Court to alter or amend its findings or judgment to clarify this issue.  The District's response does not address the City's footnote, so it's unclear whether there's a genuine dispute or misunderstanding.  As set forth in the Memorandum Opinion and Judgment, from September 23, 2023, to June 30, 2024, the District pays the "Agreements Rate" because the relevant "Applicable Percentage" is zero.  The Court does not believe there is anything in the Memorandum Opinion or Judgment that prevents the parties from calculating the Agreements Rate in accordance with the parties' previous course of dealing under the Agreements.  The Court will therefore take no action on the issue at this time.

**C.      Payment of a Sewer Development Fee**

Finally, the City asks the Court to alter or amend its findings as to the sewer development fee.  (ECF No. 156 at PageID 2611.)  After review, the court recognizes that it was incorrect to describe the sewer development fee as being "first mention[ed]" in the City's proposed findings of fact and conclusions of law because Robert Knecht briefly discussed it in the following exchange during direct examination:

> **Question:** Mr. Knecht, the judge is going to make the final decision on the length of time the District has to get off the system and what rates can be addressed. Do you have any other recommendations that you would like the judge to take in consideration when addressing this?
>
> **Answer:** Yes. We have identified some recommendations that we would like to be considered.
>
> **Question:** Would you like to share them with the judge?
>
> **Answer:** Yes. So, for example, Judge, we would like to strongly recommend what we consider a moratorium on additional flows being added to the system until the District had completed construction of their peak flow, their

13

> equalization system, for the reasons we mentioned before. They've even identified that their peak flow is causing them issues, and ultimately we have to manage that flow. So we would really want to minimize any new flows that would exacerbate it. And then once the system was up and running and functioning, we felt that it would be acceptable for residential commercial development to be added; however, we would prefer no new industrial users because we mentioned the regulatory component of permitting industries that we are concerned about and feel that we have a justification to kind of minimize that since I permit all of the industries elsewhere directly and do not have that control, it does raise a number of concerns and I think justifiable risk for us.
>
> And then as moving forward, you know, we have in our other agreements have the right to collect what we call *sewer development fees*. So as new developments come on, they pay a fee to be on our system. You're selling capacity to the -- to that project that ultimately you generally will not be able to utilize otherwise. So this is a common practice where you would pay a fee based on the water meter size to that utility, and then given that the peaking -- influence on peaking that they've referenced, we would like to see the District install a flow meter as close as possible where it captures their flow and before it's sent to us for treatment so that we get a representative, accurate and detailed volumetric flow that helps us, you know, know what's going to be coming our direction. And again, for accuracy and pragmatically, that's what we have done elsewhere with other of our customers, our bulk customers. We have incorporated flow monitoring, flow metering so that we are getting accurate information.
>
> Those are the biggest I think components other than what we have included in our standard language from the IJA perspective.

(ECF No. 141 at PageID 2616–17 (emphasis added).)

The City's Motion is therefore **GRANTED IN PART** as to amended findings about the sewer development fee under Rule 52(b). Section G., entitled "Other Miscellaneous Relief," in the Memorandum Opinion is **AMENDED** and **REPLACED** in its entirety as follows:

### G.    Sewer Development Fee

The City has asked the Court to require the District to pay the City's sewer development fees for all new developments within the District's service area that will discharge to the City's sanitary sewer system. The City's sewer development fee is set forth in Memphis Municipal Code § 13-16-2, which provides that the fee "reflects" the following:

> (1) the actual cost to provide service to such new customers connection to the System seeking an approved sewer connection for subdivisions, land developments, new buildings, and

14

redevelopments of land or buildings served by the city sanity sewer system or where the facility served requires modification of or enlargement of existing sewers, whether within or outside the corporate limits of the city and whether service is by existing or by new facilities to be constructed;

(2) a portion of the capital costs incurred by the city for the construction of wastewater treatment plant facilities and related assets, including prior upgrade and expansions; and

(3) a portion of the capital costs incurred by the city for the construction of the sewage collection and conveyance system including sewer mains, manholes, lift stations, associated appurtenances including prior upgrades and expansions.

Memphis Municipal Code § 13-16-2(A).

According to Mr. Knecht's testimony, "new developments" pay the sewer development fee because the City is "selling capacity" that it would "not be able to utilize otherwise." (ECF No. 141 at PageID 2616–17.) Mr. Knecht testified that the City's "other agreements" give them the right to collect the sewer development fee, but it is not clear what municipalities these agreements are with or the other terms of those agreements, such as rates or other fees. There is also no explanation about how the sewer development fee was calculated, and as already discussed, there is little to nothing in the record about future growth or developments in the District that would be subject to the sewer development fees.

Moreover, it appears that at least some of the costs "reflected" in the sewer development fee are already included, at least in part, in the Court's graduated volumetric rate for the District. Here's why: Start with the Agreements Rate, which is the minimum amount the District will pay after September 23, 2023. As previously explained, the "Agreements Rate" is the sum of three rates: (1) the "Interceptor Rate," (2) the "Treatment Rate," and (3) the "Expansion Rate," each of which is calculated according to its own formula. (ECF No. 135 at PageID 1666–72.) Notably, the "Expansion Rate" specifically includes "the District's share of capital costs." (ECF No. 135 at PageID 1671–72; see Exhibit 11 at District-005673; *see also* ECF No. 123 at PageID 1444.)

Then consider the Shambaugh & Michelfelder Final Report (Exhibit 19). The report explains that "[t]he total cost of service should be equal to the utility's annual operating revenue requirement," which is calculated by "establishing the revenue needed from all customer classes, which allow the utility to recover its operating costs, *its cost of capital and recovery*, and produce a margin of income which will allow the utility to remain financially viable and continue to provide safe and reliable service." (Shambaugh & Michelfelder Final Report, Exhibit 19 at COM_014888 (emphasis added).) The Shambaugh & Michelfelder Final Report

15

specifically notes that the "capital costs to collect average daily wastewater flows" are included as "flow costs"; "capital costs for plant facilities designed to meet peak requirements" are included as "demand costs"[5]; and "customer facilities costs include[d] capital and operating costs related to service connections." (*See* Exhibit 19 at COM_014889, COM_104890, COM_104895.) It then explains that, in sum, "the allocated costs related to flow, demand, customer services and customer facilities costs define the total cost of service," and were "used as input for the development of a schedule of rates and charges." (*Id.* at COM_014891.) And although the District may initially pay less than the $1.60 rate that the Shambaugh & Michelfelder Final Report determined to be the cost of service for municipal customers, the District is likely to pay *more* than that in later years. The District will eventually pay the City's Ordinance Rate, which is currently $3.32—more than twice the $1.60 rate that the cost of service study recommended.

Without more, the Court is unable to find that it would be equitable to impose the sewer development fee in these unique circumstances, and the Court will not order the District's customers to pay the City's sewer development fees.

The Court finds the City's arguments about the sewer development fee otherwise without merit, and the Motion is therefore **DENIED** as to any relief under Rules 59(e), 59(a), and 60(b) as to the sewer development fee.

## **CONCLUSION**

For the reasons set forth above, the City's Motion to Alter or Amend Findings and Judgment or, in the Alternative, for a New Trial or Relief from Judgment (ECF No. 155) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. **GRANTED IN PART** under Rule 52(b) as to amended and additional findings about the City's Sewer Use Ordinance and whether a written agreement is required;

2. **GRANTED IN PART** under Rule 52(b) as to amended and additional findings about the City's Sewer Use Development Fee; and

3. **DENIED** as to all other relief sought.

---

[5] A portion of flow costs and demand costs are specifically allocated to municipal customers in the customer cost of service allocation. (*See* Exhibit 19 at COM_014895.)

16

**IT IS SO ORDERED**, this 3rd day of June, 2024.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE