# AGREEMENT BETWEEN

# HORN LAKE CREEK BASIN INTERCEPTOR SEWER DISTRICT

and

# DESOTO COUNTY REGIONAL UTILITY AUTHORITY

This Agreement is made and entered effective <u>December</u>, 2023, by and between HORN LAKE CREEK BASIN INTERCEPTOR SEWER DISTRICT (the "District") and DESOTO COUNTY REGIONAL UTILITY AUTHORITY (the "Authority") (collectively the "Parties").

**WHEREAS,** The Horn Lake Creek Basin Interceptor Sewer District was created as a political subdivision of the State of Mississippi pursuant to House Bill No. 651, Regular Session 1971; and

**WHEREAS,** pursuant to Chapter 1039, Local and Private Laws of 1999, as amended by House Bill 1876 of the Regular Session of 2002, as amended by House Bill 1639 of the Regular Session of 2003, as amended by House Bill 1773 (the "Legislation"), the Authority's purpose is to establish a cooperative effort within Desoto County to acquire, construct, and operate sewerage systems, sewage treatment systems and wastewater systems; and

**WHEREAS,** the Authority owns, operates, and maintains a wastewater collection and treatment system that includes but is not limited to a sewer interceptor system, 13 pump stations, and six wastewater treatment facilities, one of which is the Johnson Creek Wastewater Treatment Facility; and

**WHEREAS,** pursuant to the Legislation Sections 7(d) and 8(l), the Authority may enter into any contract with any person or any public agency in furtherance of any of the purposes authorized by the Legislation upon such consideration as the board of directors and such person may agree; and

**WHEREAS,** The District is subject to certain obligations pursuant to the Court Order as defined herein; and

**WHEREAS,** the Parties have determined it is in the best interest of both the Parties and the citizens of Desoto County that the Parties fund an expansion of the Authority's Johnson Creek Wastewater Treatment Facility and associated infrastructure for transporting, treating and disposing of wastewater, to accommodate the District's wastewater currently directed to Memphis (the "Project"); and

**WHEREAS,** upon completion of the Project, the Parties have determined it is in the best interest of both the Parties and the citizens of Desoto County that the Authority treat and dispose of the District's wastewater; and

**WHEREAS,** upon completion of the Project (including any and all remaining funding obligations of the District), the District shall dissolve.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

## ARTICLE I: DEFINITIONS

Terms and expressions used in this Agreement, unless herein further defined, shall have the meaning set forth in the Agreement:

"Agreement" means this Agreement between Horn Lake Creek Basin Interceptor Sewer District and the Desoto County Regional Utility Authority.

"Authority" means Desoto County Regional Utility Authority.

"Authority System" means all of Authority's facilities for receiving, transporting, and treating of Wastewater, including the Johnson Creek Wastewater Treatment Facility, together with any improvements, enlargements, or additions to said facilities and any extensions or replacements of said facilities constructed or otherwise incorporated into said facilities in the future and including any facilities leased or otherwise utilized by Authority from an Authority Member. Said term shall include only those facilities which are used for, constructed or acquired by, or the use of which is arranged for, by the Authority and those parts of facilities to afford service to parties using the Authority System by agreement of the Members. The Authority System includes all rights-of-way, sewer interceptors and pump stations, and force mains.

"Capacity Expansion" means an increase in the transportation or treatment capacity of the Authority realized by the construction of additional treatment capacity or the addition of capital improvements which allow greater treatment capacity.

"Comprehensive Sewer Use Ordinance" means an ordinance adopted by Authority or District pursuant to the standards and requirements of Federal and State Regulatory Agencies for Publicly Owned Treatment Works of similar size and character.

"Court Order" means the Memorandum Opinion and Order dated September 22, 2023, in the matter captioned *City of Memphis v. Horn Lake Creek Basin Interceptor Sewer District and DeSoto County, Mississippi*, Case No. 2:19-cv-2864-MSN-cgc in the United States District Court for the Western District of Tennessee, including any amendments or modifications to said Order due to post-trial motions or decisions of any appellate court(s).

"District" means the Horn Lake Creek Basin Interceptor Sewer District.

"District System" means all of the District's facilities for receiving and transporting of Wastewater to the City of Memphis at the time of this Agreement, and to the Authority System in the future, together with any improvements, enlargements, or additions to said facilities and any extensions or replacements of said facilities constructed or otherwise incorporated into said facilities in the future. The District System includes only those facilities for receiving and transporting of Wastewater meeting the description in this paragraph and located within the State of Mississippi. Said term shall include only those facilities which are used for, constructed or acquired by, or the use of which is arranged for by, the District, up to any Point of Entry at which the District System discharges Wastewater into the Authority System for treatment at the Johnson

2

Creek Facility. The District System includes all rights-of-way, sewer interceptor Systems and pump stations, force mains, and storage tanks.

"Domestic Wastewater" means liquid and waterborne waste discharged from sanitary conveniences of dwellings, business buildings, institutions and the like, as distinct from wastes in Industrial Wastewater.

"Effective Date" means the date indicated on the signature page of this Agreement.

"EPA" means the United States Environmental Protection Agency.

"Force Main" means the force main to be constructed as part of the Project, whose purpose is to transport District Wastewater from the Main Pump Station to the Johnson Creek Facility.

"Industrial Wastewater" means the liquid and waterborne wastes from industrial processes as distinct from wastes in Domestic Wastewater.

"Infiltration" means water that has migrated from the ground into the Authority System or District System.

"Inflow" means water which is not Domestic Wastewater or Industrial Wastewater or Infiltration, which enters into the Authority System or District System. Inflow includes but is not limited to the following: storm water; ground water; roof run-offs; sub-surface drainage; down spouts; yard drains; fountains; ponds; and swimming pools.

"Johnson Creek Facility" means the Authority's Johnson Creek Wastewater Treatment Facility, located at 2665 Highway 61 North, Walls, Mississippi, as it exists at the time of this Agreement and including any future improvements and/or expansions.

"Main Pump Station" means the pump station to be constructed as part of the Project, whose purpose is to pump District Wastewater to the Johnson Creek Facility via the Force Main.

"MDEQ" means the Mississippi Department of Environmental Quality.

"Member" means a Member of the Authority, as defined in the Authority's Comprehensive Sewer Use Ordinance, and as "Member Agency" is defined in House Bill 1876, Local and Private Legislation, 2002 Regular Session.

"Month" means calendar month.

"Non-Member Customer" means an entity to which the Authority provides wastewater treatment services in exchange for payment, pursuant to contract, which is not a Member as defined herein.

"Point of Entry" or "Points of Entry" means the physical connection or connections between the District System and the Authority System.

EXHIBIT "A"

"Project" means the Parties' undertaking under which the Authority will: construct the pump station and force main necessary to divert the District's wastewater flow, which is presently discharged to Memphis, to DCRUA; construct a Capacity Expansion at the Johnson Creek Facility to accommodate the treatment and disposal of District's Wastewater currently directed to Memphis, including the District's responsibility for any cost increase in the effluent line to the Mississippi River associated with the District's connection to the Johnson Creek Facility; fund and design the said Expansion; and any and all necessary tasks attendant thereto. [handwritten: necessary for the District flow,]

"Wastewater" means Domestic Wastewater and Industrial Wastewater, together with such Infiltration and Inflow that may be present.

## ARTICLE II: TERM

Section 2.1 TERM. This Agreement shall expire upon the dissolution of the District as provided herein.

## ARTICLE III: PROJECT

Section 3.1 The Parties intend that the Project be designed, financed, and constructed by the Authority, via an increase in the Authority's bonding capacity, State Revolving Fund ("SRF") loans, other public funding sources, or a combination thereof. The Parties also intend for the District to comply with its obligations under the Court Order, including the requirement that the Project be completed sufficient for the entirety of the District's Wastewater flow to be directed to the Project and not to the City of Memphis by October 1, 2031 ("On-Time Completion"). In the event that the Authority is not able to obtain the required bonding capacity increase, SRF loans, and/or public funding for the Project in a timely manner consistent with On-Time Completion of the Project, the District shall, in consultation with the Cities of Horn Lake and Southaven, have the authority to provide some or all of such financing in accordance with this Agreement.

Section 3.2 The Project shall be designed and built in a manner acceptable to both Parties. Specifically, the Parties shall collaboratively determine how much additional treatment capacity they need for current and foreseeable future Wastewater treatment. The Parties shall establish a budget for the Project based upon the total additional treatment capacity to be established by the Project. The Project shall then be designed and constructed to provide the total necessary Capacity Expansion to accommodate the Parties' stated needs. The Project shall be managed, including design, construction, regulatory approvals, and the negotiation of all necessary contracts by the Authority, with the understanding that the District bears ultimate responsibility for compliance with the Court Order, including but not limited to completion no later than October 1, 2031.

Section 3.3 OWNERSHIP, USE, AND RESPONSIBILITY FOR COMPONENTS. The Authority shall have primary responsibility for overseeing and supervising the design and construction of the Project, with all Major Decisions (defined to include: selection of contractors and any other service for which bids are solicited; approval of budgets; approval of design and capacity; change orders exceeding 1% of the contract price; and field change orders affecting construction schedule, major design modification, or significant equipment or construction material substitution) subject to approval by the District, which shall not be unreasonably withheld. To ensure the Project proceeds in a manner consistent with the Court Order, the District shall have

4

the right to have representative(s) present at any and all meetings, and copied on communications involving the Major Decisions of the Project. The District shall also have the right to request and receive copies of communications involving all aspects of the Project (including but not limited to the bidding process, invoices, design discussions, etc.). Upon completion of the Project, the Authority shall be the owner of the real and personal property which includes the expanded Johnson Creek Facility, the effluent line to the Mississippi River, the main influent pump station transferring District Wastewater toward the Johnson Creek Facility, and the force main. Until such time as the District dissolves pursuant to this Agreement, the District shall have the right to utilize the Johnson Creek Facility to the fullest extent necessary to ensure the treatment of all District Wastewater. Until such time as the District dissolves pursuant to this Agreement, the District shall be the owner and operator of any newly constructed collection and conveyance facilities on the District side of the main pump station.

Section 3.4 FINANCING. It is the intent of the Parties that the maximum possible percentage of the Project be funded via SRF and/or other public funding. During the 2024 Regular Session of the Mississippi Legislature, and, if needed, the 2025 Regular Session and future Regular Sessions of the Mississippi Legislature, the Authority shall engage in all reasonable efforts to obtain a statutory increase in its bonding capacity to allow for the Authority to obtain via bond financing the funds necessary to construct the entire project, in the unlikely event that no public funding is available. Should such efforts be unable to secure sufficient funding to ensure On-Time Completion of the Project, the District, in consultation with the cities of Horn Lake and Southaven, shall have the option to obtain bond and/or private financing for the funds necessary to the completion of the Project beyond what is obtained from public sources, including but not limited to SRF loans. The Parties shall be jointly responsible for undertaking all reasonable efforts, together or separately, to obtain funding for the Project from the State of Mississippi and the Federal government. Regardless of which Party is responsible for obtaining bond funding under this Section, all funding from all sources shall be obtained in time for the Project to be fully completed no later than October 1, 2031, in accordance with the Court Order.

Section 3.5. Any debt or expense which is incurred by the Authority for the Project pursuant to Section 3.1 and is due before the District connects to the Authority, shall be paid by the District to the Authority until connection by the District. The Authority shall seek the most favorable terms possible for any such debt, as if the Authority were responsible for paying the debt itself. For each installment of debt service, the District shall pay to the Authority the amount due from the Authority to its creditor(s) a minimum of thirty (30) days before the Authority is obligated for the payment. In the event that debt incurred by the Authority is used for the Project, along with other construction which is not associated with the Project and/or construction that is required irrespective of the Project, then the District shall pay the proportional share of the debt associated with the Project to the Authority until connection by the District.

Section 3.6. Upon completion of the Project, the Authority agrees to accept and treat all volumes of Wastewater delivered by the District or its customers for treatment subject to the quantity and quality standards established by EPA, MDEQ, and the Authority. The unit of measurement for Wastewater delivered hereunder shall be in units of millions of gallons per day ("mgd"), or such other lawful unit as the parties may determine to be appropriate and applicable.

Section 3.7 The Parties shall make all Commercially Reasonable Efforts and aspire to complete design, Regulatory Approval, and construction of the Project in a timely manner so as to begin operation no later than October 1, 2031, in accordance with the Court Order.

## ARTICLE IV: INFORMATION EXCHANGE

Section 4.1 Before December 29, 2023, the District shall provide the Authority the District's average daily flow, along with the anticipated future flow along with the intermittent peak flows. In addition, the District shall provide the Authority any and all information regarding the District's customers, metering, contracts, engineering design plans and studies, and other information as reasonably requested by the Authority. The District shall provide to the Authority all information regarding the additional treatment capacity it needs for current and foreseeable future Wastewater treatment needs. Within 30 months of the execution of this Agreement, the District shall provide an assessment regarding the easements, age, inflow and infiltration, design and available capacities, operational costs and anticipated repairs and costs for repairs of its interceptor lines and facilities to the Authority for review.

## ARTICLE V: DISSOLUTION

Section 5.1 The Parties agree it is in the long-term public interest for the geographical areas currently served by the Parties for Wastewater conveyance and treatment to be served by the Authority alone. Therefore, the District shall prepare and present a plan for dissolution within one year before the completion of the Project, provided that such plan for dissolution does not violate the Court Order or future order of the Court, and that the requirement of Section 5.1.1 of this Agreement is met. However, the following Sections 5.1.1, 5.1.2, and 5.1.3 of this Agreement shall all be met before the District dissolves:

    5.1.1 The District is not obligated by debt which may not be assigned to a third party;

    5.1.2 The District has fully complied with the Court Order; and

    5.1.3 The District has obtained written agreement to assign, upon dissolution, its Interceptor lines and storage tanks to one or more of the Authority, the City of Southaven, the City of Horn Lake, the Horn Lake Water Association, and/or DeSoto County.

Such plan will be subject to the agreement and approval by the Authority, the City of Southaven, the City of Horn Lake, and the Horn Lake Water Association.

Section 5.2 In the event one or more of the conditions set forth in Section 5.1 hereof is not met at the time the Project is completed, the District shall remain in existence indefinitely until such time as all three conditions are met. The District shall, upon the satisfaction of all three conditions, prepare and present a plan for dissolution within 180 days, which plan shall be subject to agreement and approval by the Authority, the City of Southaven, the City of Horn Lake, and the Horn Lake Water Association.

Section 5.3. Upon the District's connection to the Authority, Horn Lake and Southaven shall each be allocated its respective percentage flow and, to the extent such expense is not paid

by the District, its expense percentage in accordance with the Authority's Local and Private and Service Agreement. Upon the dissolution of the District, Horn Lake and Southaven shall be designated as the retail agents for their respective applicable flows and the Authority may contract with those entities that are outside of the service areas of Horn Lake and Southaven or that serve as a water association.

Section 5.4 Upon the Effective Date of this Agreement, the District shall not enter into or assume any debt which extends beyond October 1, 2031, except as allowed under Sections 3.1 and 3.4 hereof or as otherwise approved by the Authority and governing authorities of Southaven and Horn Lake.

## ARTICLE VI: NON-MEMBER CUSTOMER

Section 6.1. This Article VI shall be effective only to the extent the three conditions set forth at Section 5.1 hereof are not met at the time the Project is completed. Upon the dissolution of the District as set forth in Article V hereof, this Article VI shall become moot.

Section 6.2 The District shall be a Non-Member Customer of the Authority and shall have no voting representation on the Authority Board. However, the District shall have the right to send a non-voting representative to all meetings of the Authority Board. Such non-voting representative shall have the right to be present for any executive session of the Authority Board where any issue enumerated in Section 3.3 hereof, or any other issue for which District input is needed, is to be discussed; however, the non-voting representative shall not have the right to be present in executive session in the event litigation regarding any issue whatsoever arises between the Authority and District.

## ARTICLE VII: TREATMENT SERVICE

Section 7.1. Every provision of this Article VII shall be effective only to the extent the three conditions set forth at Section 5.1 hereof are not met at the time the Project is completed. Upon the dissolution of the District as set forth in Article V hereof, this Article VII shall become moot.

Section 7.2 RIGHT TO DISCHARGE. Upon completion of the Project, the Authority agrees to accept and treat all volumes of Wastewater delivered by the District or its customers for treatment subject to the quantity and quality standards established by EPA, MDEQ, and the Authority. The unit of measurement for Wastewater delivered hereunder shall be in units of millions of gallons per day ("mgd"), or such other lawful unit as the parties may determine to be appropriate and applicable.

Section 7.3 The District agrees to establish and/or maintain standards for Wastewater delivered into the Authority System meeting the standards of EPA, MDEQ and Authority through its Comprehensive Sewer Use Ordinances.

Section 7.4 NONCOMPLIANT WASTEWATER. In the event the Authority becomes aware of any Wastewater entering the Authority System from the District System which does not meet the standards set forth in the Authority's Comprehensive Sewer Use Ordinance, the Authority shall notify the District of the issue within five (5) days of initial discovery. Said initial notice shall

include the date on which the noncompliant Wastewater was observed, the reason for noncompliance, and any other relevant information known to the Authority including but not limited to the approximate volume of noncompliant Wastewater, and any other characteristics of the noncompliant Wastewater. Upon receipt of such notice, the District shall work in good faith with the Authority to conduct a joint investigation seeking the source of the noncompliant Wastewater and whether it represents a continuing issue. The Parties shall thereafter engage in joint efforts to prevent future noncompliant Wastewater from entering the District System and the Authority System via any means permissible under the Comprehensive Sewer Use Ordinance and/or any other applicable law or regulation, including but not limited to requiring the discharger to implement a compliant pretreatment program or discontinuing sewer service to the discharger. In the event the Authority determines the noncompliant Wastewater represents a threat of imminent danger to human health and the environment, the Authority shall notify the District via telephone as soon as reasonably possible after discovery and the Parties shall expedite their joint investigation and resolution efforts as set forth in this Section.

Section 7.5 CAPACITY, MANAGEMENT, OPERATION, AND MAINTENANCE

7.5.1 The District shall properly manage, operate and maintain the District System, which shall include the District storage tanks when complete, in such a manner as to minimize excessive Infiltration and Inflow. Through its Comprehensive Sewer Use Ordinance, the District agrees to diligently pursue reductions in Infiltration and Inflow among its customers contributing Wastewater to the District System and the Authority System. The District will comply with sanitary sewer overflow rules ("SSO Rules") as such are promulgated by the Mississippi Department of Environmental Quality, the United States Environmental Protection Agency and any other governmental body having legal authority to set standards for municipal sewer systems of similar size and character.

7.5.2 Authority agrees to operate and maintain the Authority System in such a manner to minimize excessive Infiltration and Inflow affecting the treatment capacity of the Johnson Creek Facility, and to require through its Comprehensive Sewer Use Ordinance that the District's customers contributing Wastewater to the Johnson Creek Facility will maintain its local collection and transportation system in such a manner as to minimize excessive Infiltration and Inflow.

7.5.3 The District acknowledges that Infiltration and Inflow within the District System has the potential to interfere with the proper operation of the Authority System. The District agrees to take all reasonable steps, consistent with industry standards and including the operation of a peak-flow storage basin, to minimize Infiltration and Inflow to the extent possible. By cooperating with District to reduce such Infiltration and Inflow, Authority does not thereby assume any responsibility or liability for any Infiltration and Inflow originating within the District System delivering Wastewater to the Authority System.

7.5.4 District agrees to prevent discharge of fats, oils, and greases (FOG) in quantities of such size as to be capable of causing obstruction to the flow of Wastewater or other interference with the proper operation of the Authority System. District shall ensure that its Comprehensive Sewer Use Ordinance includes the identification and elimination of excessive FOG and is in compliance with Authority's Comprehensive Sewer Use Ordinance with respect to FOG.

EXHIBIT "A"

Section 7.6 COMPREHENSIVE SEWER USE ORDINANCE.

7.6.1 Authority shall maintain in effect its Comprehensive Sewer Use Ordinance in effect as of the date of this Agreement, with periodic review and revision as the Authority deems necessary.

7.6.2 The District shall adopt and maintain in effect a Comprehensive Sewer Use Ordinance in compliance with the Comprehensive Sewer Use Ordinance of Authority and in conformity with the standards and restrictions of the EPA, the MDEQ and any other governmental body having legal authority to set such standards and restrictions with respect to Wastewater quality. District shall periodically review and, if necessary, revise its Comprehensive Sewer Use Ordinance to ensure compliance with Federal and State standards and requirements and that of any other governmental body having legal authority to set such standards and restrictions. District agrees to file a copy of its Comprehensive Sewer Use Ordinance with Authority before beginning to discharge Wastewater into the Authority System.

Section 7.7 TITLE TO WASTEWATER AND RESPONSIBILITY THEREFOR.

7.7.1 Title to all Wastewater shall remain in District to its respective Point of Entry, and upon passing through its respective Point of Entry, title thereto and to all Wastewater therefrom shall pass to Authority. The Point of Entry, or Points of Entry, shall be the main pump station as designated by the Authority. In the event that any Point of Entry is relocated for the mutual convenience of the District and the Authority, the Parties will share the cost of relocating the Point of Entry equally.

7.7.2 As between the parties hereto, Authority is responsible for the proper reception, transportation, treatment, and disposal of all such Wastewater from the Point of Entry, and the responsibility for, and right to ownership of, the effluent and sludge from such operation, together with the responsibility for its transportation, treatment and disposal; provided, however, that the Wastewater delivered by the District to its respective Point of Entry meets applicable standards and restrictions of the Authority's Comprehensive Sewer Use Ordinance of Authority (hereinafter the "Authority Ordinance"). In furtherance of said responsibility, the Authority shall, after completion of the Project, own and operate the main pump station and the force main transporting District Wastewater from the pump station to the Johnson Creek Facility.

7.7.3 In the event and to the extent a violation of Authority Ordinance by the District contributes to a violation of any law governing the receipt, transportation or treatment of Wastewater, including a violation of any parameter of the NPDES permit, the District shall be responsible to the Authority for its proportionate share of any payments related to the violation, including, but not limited to, any lawful fines or penalties or other sums payable.

7.7.4 In the event the Authority is assessed a lawful fine or penalty for exceeding the volume of effluent dischargeable from the Authority System, the District shall be liable to the Authority only for its proportionate share of any payments related to the violation caused by the District's Wastewater, including, but not limited to, any penalties or other sums payable to the State of Mississippi or the United States of America.

EXHIBIT "A"

7.7.5 Each Party agrees to be responsible for all claims, demands, and causes of action and the damages that flow therefrom which may be asserted by anyone on account of the action or inaction of that Party. However, to the extent any cause of action is covered by the Mississippi Torts Claims Act, sections 11-46-1 et seq. of the Mississippi Code of 1972, as amended, or to the extent same applies to any action, nothing contained herein shall be construed to waive any cap or limitation of damages under such Act.

7.7.6 If any of the events covered in this section result in payment demands on Authority, the District shall be notified as soon as practicable by Authority that demand has been made upon Authority for payment and shall provide the District an opportunity to participate in negotiations resolving such demand for payment.

Section 7.8 METERING.

7.8.1. The Authority, or Horn Lake and Southaven if said municipalities separately agree, will furnish, install, operate and maintain the Metering Station at the Point of Entry, or at other Points of Entry as may be established in the future, and the necessary equipment and devices of standard type for measuring properly all Wastewater to be discharged under this Agreement. The Metering Station and other measuring equipment shall remain the property of the Authority or Horn Lake and Southaven.

7.8.2. As set forth in Section 5.3, Horn Lake and Southaven shall be allocated their respective percentage flows and, to the extent such expense is not paid by the District, its expense percentage in accordance with the Authority's Local and Private and Service Agreement. The metering obligations and responsibilities of the Authority, Horn Lake and Southaven shall be governed by the Service Agreements between parties.

7.8.3. The District shall have access to the Metering Station at the respective Point of Entry at all reasonable times for inspection and examination, but the reading, calibration, and adjustment thereof shall be done only by employees or agents of the Authority, after providing reasonable notice, in the presence of a representative of the District if requested by the District. All readings of the Metering Stations will be entered upon proper books of record maintained by the Authority. Upon written request, the District may have access to said record books during reasonable business hours. The District shall have the right to audit the Authority's Metering Station records at any time upon reasonable notice.

7.8.4 As needed, but not less than once each Calendar Year, the Authority shall calibrate each Metering Station, in the presence of a representative of District if requested by District. The Authority shall give District reasonable notice of any calibration event sufficient to give District the opportunity to send a representative. If, for any reason, any Metering Station is out of service or out of repair, or if, upon any test, any Metering Station is found to be inaccurate by five percent (5%) or more, plus or minus, registration thereof shall be corrected for a period of time extending back to the time when such inaccuracy began, if such time is ascertainable, and if such time is not ascertainable, then for a period extending back one-half of the time elapsed since the date of the last calibration, but in no event further back than a period of three (3) months.

EXHIBIT "A"

7.8.5 District may, at its option and its own expense, install and operate a check meter to verify flows measured by any meter installed by the Authority. The measurement for the purpose of this Agreement shall be solely by the Authority's meters; however, in the event of a discrepancy between a check meter and an Authority meter, District shall have the right to request calibration of the Authority meter. Any necessary adjustments revealed by such calibration shall be governed by Section 4.7.3 above. All District check meters shall be of standard make and shall be subject at all reasonable times to inspection and examination by any employee or agent of the Authority, but the reading, calibration and adjustment thereof shall be made only by the District.

7.8.6 The District shall from time to time inform the Authority of each District customer's Wastewater flow into the District System, to allow Authority to credit said customers for their Wastewater flow volumes for purposes of voting share on the Authority Board.

## ARTICLE VIII: DISCHARGE AND PRETREATMENT STANDARDS

Section 8.1. This Article VIII shall be effective only to the extent the three conditions set forth at Section 5.1 hereof are not met at the time the Project is completed. Upon the dissolution of the District as set forth in Article V hereof, this Article VIII shall become moot.

Section 8.2 PRETREATMENT COMPLIANCE. The District understands and acknowledges that the Authority is required to implement and enforce a pretreatment program to control discharges from industrial users to its Wastewater treatment facilities pursuant to requirements set out in the Federal Clean Water Act, 42 U.S.C. § 1251 et seq., and the rules and regulations promulgated thereunder, including 40 C.F.R. Part 403, and applicable Mississippi laws and regulations, all as now stated and as may hereafter be amended. The District agrees not to knowingly accept Wastewater from any user which: A) should be subject to any such pretreatment laws and/or regulations and which does not have an applicable pretreatment permit; or B) is in violation of any such pretreatment permit. If the District becomes aware of Wastewater in its System originating from any such user in violation of applicable pretreatment laws and regulations, District shall inform Authority of such violation within five (5) days.

## ARTICLE IX: RATES, BILLING, AND PAYMENTS

Section 9.1. This Article IX shall be effective only to the extent the three conditions set forth at Section 5.1 hereof are not met at the time the Project is completed. Upon the dissolution of the District as set forth in Article V hereof, this Article IX shall become moot.

Section 9.2 The District hereby agrees to pay to Authority, commencing with the connection of the District to the Authority at the same rate as the Authority's non-member customers and such rate shall not exceed the rate paid by the Authority members.

Section 9.3 By separate agreement, the Parties may override this Article IX and instead allow the Authority to contract directly with the District's customers for rates, billing, and payments, with the understanding that in such scenario the District would continue to have the authority to separately charge its customers for the operation and maintenance of the District's own System.

## ARTICLE X: BREACH AND NOTICE

Section 10.1. This Article X shall be effective only to the extent the three conditions set forth at Section 5.1 hereof are not met at the time the Project is completed. Upon the dissolution of the District as set forth in Article V hereof, this Article X shall become moot.

Section 10.2 DEFAULT.

10.2.1 Default by District. Each of the following constitutes a default by the District under this Agreement:

10.2.1.1 District fails to pay any amount of a bill, including any applicable interest and penalties, within 60 days of the due date; or

10.2.1.2 District fails to perform or observe any obligation, condition, or term of, or arising from, this Agreement that it is to perform or observe. A default may arise under this section *only* if: 1) Authority provides written notice of the District's alleged failure; and 2) the District does not dispute the alleged failure or, after good-faith discussions, the Parties agree the alleged failure has taken place; and 3) District has not cured the failure, or begun good-faith efforts to cure the failure, within six (6) months after the alleged failure has been confirmed. In the event the failure is one that cannot reasonably be cured in full within six months, the District shall not be in default for as long as it is engaged in reasonable efforts to cure the failure. The District shall provide to the Authority monthly written reports on such efforts until the failure is cured.

10.2.2 Default by Authority. Each of the following constitutes a default by Authority under this Agreement:

10.2.2.1 Authority fails to accept and treat the Wastewater transported to each Point of Entry by the District; or

10.2.2.2 Authority fails to perform or observe any obligation, condition or term of, or arising from, this Agreement that it is to perform or observe. A default may arise under this section *only* if: 1) District provides written notice of Authority's alleged failure; and 2) Authority does not dispute the alleged failure or, after good-faith discussions, the Parties agree the alleged failure has taken place; and 3) Authority has not cured the failure, or begun good-faith efforts to cure the failure, within six (6) months after the alleged failure has been confirmed. In the event the failure is one that cannot reasonably be cured in full within six months, the Authority shall not be in default for as long as it is engaged in reasonable efforts to cure the failure. The Authority shall provide to the District monthly written reports on such efforts until the failure is cured.

Section 10.3 REMEDIES.

10.3.1 In the event of a default, the parties shall have the following rights and remedies:

10.3.1.1 In addition to any other remedies available at law or equity, Authority and District agree and recognize that the rights and obligations set forth in the Agreement are unique and of such a nature as to be inherently difficult or impossible to value monetarily. If one party does not perform in accordance with the specific wording of any of the

EXHIBIT "A"

provisions in this Agreement applicable to that party, defaults, or otherwise breaches this Agreement, an action at law for damages or other remedies at law may be wholly inadequate to protect the unique rights and interests of the other party to the Agreement. Therefore, the parties agree that a breach of this Agreement may be remedied by specific performance. The Parties agree that the remedy of specific performance is not exclusive and is in addition to any other remedy available to the parties.

10.3.1.2 Cumulative Rights and Remedies. The Parties do not intend that any right or remedy given to a party on the breach of any provision under this Agreement be exclusive. Each such right or remedy is cumulative and in addition to any other remedy provided in the Agreement or otherwise available at law or in equity. If the non-breaching party fails to exercise or delays in exercising any right or remedy, the non-breaching party does not thereby waive that right or remedy. Furthermore, no single or partial exercise of any right, power, or privilege precludes any further exercise of a right, power, or privilege granted by this Agreement or otherwise.

10.3.1.3 Forum for Any Claim or Action. Any claim or action brought by any Party relating to this Agreement and its subject matter shall be brought in the Chancery or Circuit Courts of Desoto County.

## ARTICLE XI: GENERAL PROVISIONS

Section 11.1 CONSTRUCTION OF AGREEMENT. Each Party, with the assistance of competent legal counsel, has participated in the drafting of this Agreement and any ambiguity should not be construed for or against any party on account of such drafting.

Section 11.2 AUTHORITY TO ENTER INTO THIS AGREEMENT. Each Party represents and warrants that its respective obligations herein are legal and binding obligations of such party, that each Party is fully authorized to enter into this Agreement, and that the persons signing this Agreement hereinafter for each Party has been duly authorized to sign this Agreement on behalf of said Party.

Section 11.3 NOTICE. Any notice required under this Agreement shall be written and shall be served either by personal delivery, mail, email if receipt is acknowledged, or fax.

Section 11.3.1 In the case of service by personal delivery, email if receipt is acknowledged, or fax, no additional time, in days, shall be added to the time in which a right may be exercised, or any act may be done.

Section 11.3.2 In the case of service by mail, notice must be deposited in a post office, mailbox, sub post office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service, in a sealed envelope, with postage paid, addressed to the representative(s) of the party on whom it is to be served, at the office set forth below. The service is complete at the time of deposit. Any period of notice and any right or duty to do any act or make any response within any period or on a date certain after service of notice by mail shall be extended five (5) days. Any period of notice and any right or duty to do any act or make any response within any period or on a date certain after

EXHIBIT "A"

service of notice by express mail or other method of delivery providing for overnight delivery shall be extended by two court days.

Section 11.3.4 Any notice required by this Agreement shall be served on the following representative(s) of the parties:

IF TO AUTHORITY:

Desoto County Regional Utility Authority
Attn: Executive Director
365 Losher Street, Ste. 310
Hernando, MS 38632

IF TO DISTRICT:

Horn Lake Creek Basin Interceptor Sewer District
Attn: District Manager
979 Rasco Road
Southaven, MS 38671

Section 11.4 ENTIRE AGREEMENT. This Agreement constitutes the full and final understanding of the Parties with respect to the subject matter hereof and supersedes and replaces any and all prior or contemporaneous agreements or understandings, whether written or oral, express or implied, between the Parties with respect to the subject matter of the Agreement.

Section 11.5 SUCCESSORS AND ASSIGNS. This Agreement shall be binding upon and inure to the benefit of each Party hereto and their respective heirs, legal representatives, successors and assigns. This Agreement may not be assigned without the prior written consent of the other Party.

Section 11.6 DISPUTE RESOLUTION.

11.6.1 Exclusive Dispute Resolution Mechanism. It is the intent of the Parties that they shall collaborate to resolve any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination, or invalidity hereof (each, a "Dispute") in a mutually agreeable manner. The procedures set forth in this Section 11.6 shall be the exclusive mechanism for resolving any Dispute that may arise from time to time, and shall be an express condition precedent to litigation. Nothing in this Section shall be construed to limit the District's ability to terminate this Agreement pursuant to Section 11.13.

11.6.2 Negotiations. The Parties agree that they shall first use their best efforts to settle any Dispute informally through negotiations involving themselves or their representatives they each deem appropriate at the lowest possible levels of decision-making. A Party shall send written notice to the other Party of any Dispute ("Dispute Notice"). In the event that such Dispute is not resolved on an informal basis within thirty (30) calendar days after one Party delivers the Dispute Notice to the other party, either Party may, by written notice to the other Party ("Escalation to Executive Notice"), refer such Dispute to each Party's respective governing Board. The Party sending the Dispute

EXHIBIT "A"

Notice and the Escalation to Executive Notice shall send such notices in compliance with this Agreement's notice provisions set forth at Section 11.3 of this Agreement. If the Executives cannot resolve the Dispute during the time period ending fifteen (15) calendar days after the date of the Escalation to Executive Notice (the last day of such time period is designated as the "Escalation to Mediation Date"), either Party may initiate mediation as set forth in Section 11.6.3 below.

11.6.3 Mediation. Subject to Section 11.6.2, the Parties may, at any time after the Escalation to Mediation Date, submit the Dispute to any mutually agreed-to mediation service for mediation by providing to the mediation service a joint, written request for mediation, setting forth the subject of the Dispute and the relief requested. The Parties shall cooperate with one another in selecting a mediation service and shall cooperate with the mediation service and with one another in selecting a neutral mediator and in scheduling the mediation proceedings. The Parties covenant that they will use commercially reasonable efforts in participating in the mediation. The Parties agree that the mediator's fees and expenses and the costs incidental to the mediation will be shared equally between the Parties. The Parties further agree that all offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the Parties, their agents, employees, experts, and attorneys, and by the mediator and any employees of the mediation service, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any litigation, arbitration, or other proceeding involving the Parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

11.6.4 Litigation as a Final Resort. If the Parties cannot resolve any Dispute for any reason, including, but not limited to, the failure of either Party to agree to enter into mediation or agree to any settlement proposed by the mediator, within ninety (90) calendar days after the Escalation to Mediation Date, either Party may file suit in a court of competent jurisdiction.

Section 11.7 FORCE MAJEURE. Neither Party shall be deemed in default hereunder, nor shall either Party be responsible for any delay, interruption, or cessation in the performance of its obligations under this Agreement where such failure of performance is the result of any force majeure event, including, but not limited to, acts of God, riots, wars, strikes, epidemics, acts of governmental authorities (excluding the Parties to this Agreement), or acts of nature or other similar cause.

Section 11.8 SEVERABILITY. If any terms or provisions of this Agreement are held to be illegal, invalid or unenforceable as a matter of law, such provision shall be fully severable, and the remaining provisions of this Agreement shall remain in full force and effect and continue to be binding and shall not be affected by such provision or by its severance herefrom. Furthermore, in lieu of such unlawful, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such unlawful, invalid or unenforceable provision as may be possible.

Section 11.9 GOVERNING LAW. The terms and conditions of this Agreement shall be construed in accordance with and governed by the laws of the State of Mississippi.

EXHIBIT "A"

Section 11.10 AMENDMENTS OR CHANGES TO AGREEMENT. Any amendments or changes to the terms of this Agreement shall be made in writing and executed by both Parties. No change or amendment shall be valid unless and until it has been executed by both Parties.

Section 11.11 COUNTERPARTS. This Agreement may be signed in counterpart signature pages, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument. Signature pages may be signed by hand or using commercially-accepted, secure electronic signing software, and may be transmitted by facsimile or electronically. Any such signature shall have the same legal effect as an original.

Section 11.12 WAIVER. No term or provision of this Agreement, or of any document executed pursuant hereto, shall be held to be waived, modified or deleted unless in writing and executed by the Parties hereto. No delay or failure of either Party to enforce any right or provision of this Agreement or in any document executed pursuant hereto shall operate as a waiver or relinquishment of either Party's right to subsequently enforce and compel strict compliance with such provision or any other provision herein or in any document related hereto.

Section 11.13 TERMINATION

11.13.1 BEFORE CONNECTION. In the event of default by Authority of any of its obligations under this Agreement relating to the Project, or in the event the District determines constructing the Project pursuant to this Agreement will not allow the District to fully comply with the Court Order, the District shall have the right to terminate this Agreement and proceed to construct a separate project for the long-term treatment of its wastewater. The District shall be required to provide sixty (60) days' notice of its intent to terminate the Agreement pursuant to this Section, and shall be responsible for all outstanding debts and obligations at the time of such notice, if any.

11.13.2 AFTER CONNECTION. The Parties recognize the unique nature of this Agreement and their joint intent that this Agreement be in full force and effect until such time as the District dissolves pursuant to Article V hereof. Therefore, consistent with the public interest, this Agreement may not be terminated after the District connects to the DCRUA system by either Party. After such connection, this Agreement shall terminate only upon the dissolution of the District.

REMAINDER OF PAGE LEFT BLANK

EXHIBIT "A"

IN WITNESS WHEREOF, the Parties hereto, acting under authority of their respective governing bodies, have caused this Agreement to be duly executed in several counterparts, each of which shall constitute an original, all as of the 21 day of December, 2023.

DESOTO COUNTY REGIONAL UTILITY AUTHORITY

By: _____
Wayne Spell, Executive Director

Attest: _____
Secretary

IN WITNESS WHEREOF, the Parties hereto, acting under authority of their respective governing bodies, have caused this Agreement to be duly executed in several counterparts, each of which shall constitute an original, all as of the 21 day of December, 2023.

HORN LAKE CREEK BASIN INTERCEPTOR SEWER DISTRICT

By: _____
Winn D. Brown, Jr., Board President
Chairman

Attest: _____
Secretary

EXHIBIT "A"